Derek **KEELING**, Appellant,

v.

**COMMONWEALTH of Kentucky,**
Appellee.

No. 2010–SC–000351–MR.

Supreme Court of Kentucky.

Oct. 25, 2012.

Linda Roberts Horsman, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General of Kentucky, Gregory C. Fuchs, Assistant Attorney General, Office of the Attorney General, Office of Criminal Appeals, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice SCOTT.

A Graves Circuit Court jury found Appellant, Derek Keeling, guilty but mentally ill of murder and first-degree assault. Appellant received sentences of life in prison for the murder conviction and twenty years in prison for the assault conviction. He now appeals as a matter of right, Ky. Const. § 110(2)(b), alleging that the trial court erred by: (1) failing to grant his motion to dismiss; (2) failing to give jury instructions consistent with this Court's precedent; (3) finding him competent to stand trial; (4) failing to instruct the jury on assault under extreme emotional disturbance; (5) failing to suppress statements made to law enforcement officers; and (6) failing to sever the murder charge from the assault charge.

## I. BACKGROUND

Appellant suffers from schizophrenia, paranoid type. He was also involved in an altercation as a young man in which he was struck in the head with a baseball bat. Shortly after this incident, Appellant's behavioral decline began to accelerate. For example, he believed that people on television were speaking directly to him; he heard voices with Jamaican accents telling him to kill himself and that by doing so he would be a superhero; he believed he could communicate with animals; he claimed that his father was Michael Jordan and that his mother was Princess Diana; he claimed that he had several daughters, when he in fact had none; and he displayed "inappropriate affect"—a condition which manifested itself in Appellant with him laughing in very serious situations.[1]

On May 27, 2004, William "Dick" Morefield was performing yard work for an acquaintance when Appellant approached him and asked him for a lighter. When Morefield reached for his lighter, Appellant grabbed his shoulder and stabbed him in the chest. It was the first time that Morefield had ever seen Appellant.[2]

The following evening, Appellant's father, Sam—also a schizophrenic—told Appellant's mother that the police were looking for Appellant for stabbing Morefield. Appellant and his father fought three or four times that night and into the early morning of May 29. Around 5:00 that morning, Appellant began making breakfast. Sam came into the kitchen and an argument ensued, ending with Appellant stabbing Sam in the chest. Appellant fled the scene while Sam staggered next door to Appellant's mother's home. Sam later died from the stab wounds. Police quickly apprehended Appellant, who gave a statement in which he admitted to stabbing both Sam and Morefield.

So began the pretrial litigation in this case that would last six years. Appellant was first indicted in 2004, but that indictment was dismissed based on a finding that Appellant was incompetent to stand trial. The indictment on which the trial in

---

1. For example, Appellant's mother testified that he giggled at his grandmother's funeral.

2. As will be discussed *infra*, Appellant disputes this version of the facts.

this case commenced was brought in 2008, and on September 15, 2009, the Graves Circuit Court held another competency hearing.[3] At the hearing, the trial court heard testimony from two doctors—Dr. Amy Trivette who concluded that Appellant was competent to stand trial, and Dr. Richard Sively, who concluded that Appellant was *not* competent to stand trial. After considering the testimony of both doctors, the trial court determined Appellant to be competent.

Ultimately, a jury found Appellant guilty but mentally ill of murder and first-degree assault. It recommended a sentence of life in prison for the murder conviction and twenty years in prison for the assault conviction; the trial court adopted these recommendations. We now affirm.

Additional facts will be developed throughout the opinion where helpful to our analysis.

## II. ANALYSIS

Appellant sets forth six separate arguments as grounds for reversal. Each issue has been properly preserved for appellate review.

### A. Denial of Appellant's Motion to Dismiss

Appellant first contends that the trial court committed reversible error by failing to grant his motion to dismiss the 2008 indictment. He argues that when the trial

3. This was apparently the second competency hearing on this indictment as the Court of Appeals granted mandamus setting aside the first.

4. The double-jeopardy clause of the Fifth Amendment to the U.S. Constitution applies to the states through the Fourteenth Amendment Due Process Clause. *Benton v. Maryland*, 395 U.S. 784, 794, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

5. The record does not reflect why the trial court denied this motion to dismiss. Defense

court dismissed the original 2004 indictment after finding Appellant incompetent to stand trial, its failure to specify whether the dismissal was "with prejudice" or "without prejudice" defaulted to a dismissal *"with* prejudice" by virtue of Kentucky Rule of Civil Procedure (CR) 41.02(3) and our case law interpreting it. As such, he argues, the dismissal of the original indictment acted as an adjudication upon the merits, and re-indicting him on the same charges was barred by *res judicata* and double jeopardy prohibitions in violation of the United States and Kentucky Constitutions. U.S. Const. amend. V;[4] Ky. Const. § 13.

■ Because the trial court's denial of Appellant's motion to dismiss was based upon a conclusion of law,[5] we review *de novo. See Lee v. Commonwealth*, 313 S.W.3d 555, 556 (Ky.2010) (applying *de novo* review to question of law involving trial court's decision to deny motion to suppress).

CR 41.02(3) states:

Unless the court in its order for dismissal otherwise specifies, a dismissal under this Rule, and any dismissal not provided for in Rule 41, other than a dismissal for lack of jurisdiction, for improper venue, for want of prosecution under Rule 77.02(2), or for failure to join a party under Rule 19, operates as an adjudication upon the merits.

counsel argued this motion orally in chambers, and the trial judge orally, and summarily, denied the motion. Thus, there is no written order explaining the court's reasoning. However, the only conceivable grounds on which to deny this motion involve questions of law—e.g., that CR 41.02(3) did not require dismissal with prejudice, that denying Appellant's motion to dismiss did not violate his double jeopardy rights, or that re-indicting him was not barred by *res judicata*.

Because Kentucky does not have a parallel rule of *criminal* procedure dealing with involuntary dismissals, we have previously applied CR 41.02(3) to criminal proceedings by virtue of RCr 13.04.[6] Indeed, we have significant case law applying CR 41.02(3) that is procedurally on point with the case at bar. *See Commonwealth v. Taber*, 941 S.W.2d 463 (Ky.1997); *Commonwealth v. Hicks*, 869 S.W.2d 35 (Ky. 1994). In fact, *Taber and Hicks* would require reversal in this case. However, these cases ignored a necessary inquiry: whether application of CR 41.02(3) is unconstitutional as a separation of powers violation when applied to criminal cases.

*1.* **Commonwealth v. Hicks *and* Commonwealth v. Taber**

In *Commonwealth v. Hicks*, the trial court, frustrated that a subpoenaed witness failed to appear in court, denied the Commonwealth's motion to continue and granted the defendant's motion to dismiss. 869 S.W.2d at 36. The court orally cited "lack of prosecution" for its decision,[7] and informed the parties that the charges could be refiled. *Id.* However, the court's written notations with respect to the dismissal stated only: "The Commonwealth's motion to continue is overruled and the defense motion to dismiss is sustained." *Id.*

The sole issue for the Court in *Hicks* was whether the trial court's written notation of its order dismissing the indictment must be construed as a dismissal *with prejudice* in light of CR 41.02(3). *Id.* at 37. First, it noted that despite the trial judge's oral pronouncement that the charges could be refiled, a "judgment," as defined by RCr 13.04, is a *"written order...."* *Id.* "Moreover," it added, " '[o]ral statements or pronouncements are not judgments until embodied in a writing.' " *Id.* at 38 (*quoting* 7 Bertelsman and Philips, *Kentucky Practice*, CR 54.01, cmt. 2 (4th ed.1984)). When written and oral statements of the court are inconsistent, the written statements "shall prevail and the [oral statements] shall be disregarded." *Id.* The trial court's oral comments concerning the refiling of the charges were therefore inconsequential. *Id.*

The Court then applied CR 41.02(3) to the written order of dismissal. *Id.* It noted that the rule requires that "a judgment or order of dismissal, except on the grounds noted in the Rule, must be construed as being with prejudice unless it says otherwise." *Id.* Because the written order did not specify dismissal *without* prejudice (or "with leave to refile"), it determined that the dismissal was *with* prejudice. *Id.* And because the Commonwealth did not move to amend the order or take an appeal from the order, said order "became final and subsequent litigation was thereby barred." *Id.*

In *Commonwealth v. Taber*, 941 S.W.2d 463 (Ky.1997), on a procedural posture nearly identical to *Hicks*, this Court came to the same conclusion as it had in *Hicks*.

The rule of strict construction announced in *Hicks* and reaffirmed in *Taber* would require reversal in this case because the trial court's written order of dismissal does not specify dismissal "without prejudice" or "with leave to refile." However, as noted previously, neither *Hicks* nor *Taber* addressed the constitutionality of applying CR 41.02(3) to criminal cases.

*2.* **Separation of Powers**

---

6. RCr 13.04 provides: "The Rules of Civil Procedure shall be applicable in criminal proceedings to the extent not superseded by or inconsistent with these Rules of Criminal Procedure."

7. The court had already granted a previous motion to continue submitted by the Commonwealth.

The Kentucky Constitution establishes a government of three branches, among which powers are divided to achieve a system of checks and balances.

The powers of the government of the Commonwealth of Kentucky shall be divided into three distinct departments, and each of them be confined to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another.

Ky. Const. § 27.

No person or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted.

Ky. Const. § 28.

In a series of recent cases, this Court explored the question of when action by the judicial branch impermissibly encroaches on powers reserved for the executive branch. First, in *Flynt v. Commonwealth*, 105 S.W.3d 415, 424 (Ky.2003), this Court held that a trial court could not permit a defendant to participate in a pretrial diversion program over the Commonwealth's objection. At issue in that case was the interpretation of KRS 533.250(2), which specifically grants the trial court the authority to order pretrial diversion "[u]pon the request of the Commonwealth's attorney."

■ Whether a trial court could approve diversion over the objection of the Commonwealth called into question separation of powers issues because RCr 8.04(5) provides that a defendant's charges "shall be dismissed with prejudice" upon completion of a pretrial diversion program. Therefore, by ordering diversion over the Commonwealth's objection, the trial court could have unilaterally prevented the prosecution of a crime if the defendant successfully completed the program. We concluded that:

To interpret KRS 533.250(2) as permitting a trial court to approve pretrial diversion applications over the Commonwealth's objection—and thus conferring upon circuit courts the discretionary authority that we have previously held to be within the exclusive province of the executive branch—would construe it in a manner inconsistent with Kentucky's constitutional separation of powers provisions

*Id.* at 426. Thus, separation of powers principles demand the consent of the prosecuting attorney before a trial court can approve a defendant's application for a pretrial diversion program. *Id.*

Second, in *Hoskins v. Maricle*, 150 S.W.3d 1 (Ky.2004), we addressed the question of whether a trial court "exercise[s] powers belonging exclusively to the executive department of government" when it rejects a plea agreement reached between the Commonwealth and a criminal defendant. *Id.* at 11. We held that it did not, noting that "since at least 1854 [Kentucky law] has permitted a Commonwealth's attorney to *dismiss* an indictment but only 'with the permission of the court.'" *Id.* at 12–13 (*quoting* M.C. Johnson, Joshua Harlan & J.W. Stevenson, *Code of Practice in Criminal Cases* § 241 (eff. July 1, 1854)) (citations omitted). However, we also indicated that the converse is equally true—that is, "subject to rare exceptions usually related to a defendant's claim of a denial of the right to a speedy trial, a trial judge has no authority, *absent consent of the Commonwealth's attorney,* to dismiss, amend, or file away before trial a prosecution based on a good indictment." *Id.* at 13 (emphasis added) (citations omitted). This interpretation,

we concluded, is consistent with Constitutional separation of powers principles. *Id.*

Finally, in *Gibson v. Commonwealth,* 291 S.W.3d 686, 691 (Ky.2009), we unanimously held that the trial court did not have the authority to designate a pretrial indictment dismissal as "with prejudice" over the objection of the Commonwealth's attorney. At issue in that case was the criminal rule dealing with *voluntary* dismissals, RCr 9.64, which states that the Commonwealth may dismiss an indictment "with the permission of the court." On the eve of trial, the trial court granted the Commonwealth's motion to dismiss the charges against the defendant "without prejudice." *Id.* at 687. The defendant moved the trial court to designate the dismissal "with prejudice." *Id.* at 687–88. The Commonwealth objected and the trial court denied the defendant's motion to amend. *Id.* at 688.

Relying on *Flynt* and *Maricle,* we concluded that separation of powers principles precluded trial courts from dismissing an indictment "with prejudice" over the Commonwealth's objection. *Id.* at 690. To permit such action "would vest the judicial branch with the discretion to unilaterally terminate a criminal prosecution permanently." *Id.* We noted that "[t]here are a variety of situations which may result in a dismissal of a criminal case under circumstances which, against the wishes of the Commonwealth, preclude further adjudication and are, in effect, a dismissal 'with prejudice,' " *id.* at 691, e.g., violations of a defendant's right to a speedy trial, mistrials occurring after jeopardy attaches, and severe cases of prosecutorial misconduct. However, we recognized that:

> [I]t is the underlying substantive law, not the judge's discretion, that precludes further litigation. *A judge cannot, simply by the exercise of his own discretion however well founded it may be, pre-clude future prosecution with a designation of a voluntary dismissal as "with prejudice," in the absence of substantive law justifying same.*

*Id.* (emphasis added).

The question we must now answer is whether the civil rule for *involuntary* dismissals, CR 41.02(3)—which defaults a trial court's order dismissing an indictment to a dismissal "with prejudice" when the order does not specify otherwise—may constitutionally be applied to criminal cases. Based upon the sound reasoning of *Maricle, Flynt,* and *Gibson,* we hold that it may not.

*Gibson* is particularly helpful to our analysis here. In that case we indicated that "vest[ing] the judicial branch with the discretion to unilaterally terminate a criminal prosecution permanently" is inconsistent with separation of powers principles. *Id.* at 690. Here, interpreting CR 41.02(3) as requiring a dismissal "with prejudice" when there is no indication on the order of dismissal to the contrary does precisely what *Gibson* holds is impermissible: it vests in the trial court the unilateral power to prevent future prosecution of a criminal case. *See id.* Because this is constitutionally impermissible, a trial court's dismissal of a criminal case cannot be "with prejudice" without the consent of the Commonwealth *unless* it is one of those rare situations in which the underlying substantive law precludes further adjudication—e.g., violations of the right to a speedy trial, a mistrial that occurs after jeopardy attaches, or severe cases of prosecutorial misconduct. *Id.* at 690–91; *see also Hoskins,* 150 S.W.3d at 13; *Commonwealth v. Baker,* 11 S.W.3d 585, 590 (Ky.App.2000) (recognizing that prosecutorial misconduct may rise to such an egregious level, as to justify dismissal with prejudice). The only remaining question is whether a dismissal

for lack of competency to stand trial is one of these rare situations.

KRS 504.110(2), which directs the trial court's handling of a defendant after a competency hearing, provides: "If the court finds the defendant incompetent to stand trial but there is no substantial probability he will attain competency in the foreseeable future, it shall conduct an involuntary hospitalization proceeding under KRS Chapter 202A or 202B." [8] Notably, KRS 504.110(2) does not direct the court to dismiss the indictment—nor do any relevant provisions in KRS Chapter 202A or 202B.

More informative is KRS 504.090, which provides: "No defendant who is incompetent to stand trial shall be tried, convicted or sentenced *so long as the incompetency continues.*" (Emphasis added.) This statute assumes that a defendant found incompetent to stand trial may attain competency in the future. More importantly, it implicitly preserves the Commonwealth's authority to prosecute that defendant if and when he does attain competency. This strongly suggests that dismissal based upon lack of competency to stand trial is *not* one of those situations in which the underlying substantive law effectively results in a dismissal "with prejudice." *See Gibson,* 291 S.W.3d at 690–91; *Hoskins,* 150 S.W.3d at 13.

Additionally, lack of competency to stand trial is substantively dissimilar to the other dismissal scenarios we treat as "with prejudice." For example, the Sixth Amendment to the U.S. Constitution affirmatively bestows upon a criminal defendant the right to a speedy trial.[9] Accordingly, if this right is violated the case must be dismissed and further prosecution is barred. *See Barker v. Wingo,* 407 U.S. 514, 522, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) ("The amorphous quality of the right [to a speedy trial] also leads to the unsatisfactorily severe remedy of dismissal of the indictment when the right has been deprived."). This is an obvious result given that permitting further prosecution would exacerbate the violation.

Similarly, the Fifth Amendment specifically prohibits the government from prosecuting an individual for the same crime twice.[10,11] Accordingly, a mistrial after jeopardy attaches must result in dismissal of the charges, and further prosecution is barred unless (1) "there is a 'manifest necessity' for a mistrial or (2) the defendant either requests or consents

---

8. The trial court's order of February 14, 2005, dismissing the original indictment includes a finding that Appellant "is not competent to stand trial and there is no substantial probability that he will attain competency."

9. The Sixth Amendment right to a speedy trial applies to the states via the Due Process clause of the Fourteenth Amendment. *Barker v. Wingo,* 407 U.S. 514, 515, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *Klopfer v. North Carolina,* 386 U.S. 213, 222–23, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967).

10. The Fifth Amendment prohibition against double jeopardy applies to the states via the Due Process clause of the Fourteenth Amendment. *Benton v. Maryland,* 395 U.S. 784, 794, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

11. By enacting KRS 505.030, the legislature has defined certain circumstances in which a prosecution for an offense is barred by a previous prosecution for that same offense. Essentially, this provision codifies and describes what constitutes "double jeopardy" in the Commonwealth. However, the case at bar does not fit within any of the circumstances contemplated by KRS 505.030, as jeopardy had not attached at the time of the original dismissal. *See Cardine v. Commonwealth,* 283 S.W.3d 641, 646–47 (Ky.2009) (holding KRS 505.030(4) unconstitutional and citing *Crist v. Bretz,* 437 U.S. 28, 35, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978) for proposition that jeopardy attaches when the jury is empanelled and sworn).

to a mistrial.'" *Cardine*, 283 S.W.3d at 647 (*quoting Commonwealth v. Ray*, 982 S.W.2d 671, 673 (Ky.App.1998)). This result is also obvious given that permitting further prosecution would explicitly violate the right the Fifth Amendment seeks to protect.

Likewise, Constitutional due process guarantees may be implicated in gross cases of prosecutorial misconduct, requiring a dismissal with prejudice. Normally, prosecutorial misconduct will not rise to a level so egregious as to require a court to exercise its supervisory powers to prevent re-indictment. *See U.S. v. Lawson*, 502 F.Supp. 158, 169–73 (D.Md.1980) (collecting cases and discussing remedies for prosecutorial misconduct). However, "outrageous government conduct could taint evidence irrevocably, or prejudice a defendant's case on the merits such that notions of due process and fundamental, fairness would preclude reindictment...." *Id.* at 172 (*citing United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973)). We emphasize that dismissal *with* prejudice for instances of prosecutorial misconduct is the exception, to be employed only in the most severe cases that result in substantial prejudice to the defendant. *See Bank of Nova Scotia v. U.S.*, 487 U.S. 250, 263, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988) (discussing alternative remedies for prosecutorial misconduct that do not result in prejudice to the defendant).

Conversely, there is no rule, Constitutional or otherwise, that specifically bars prosecution of a formerly incompetent defendant once he attains competency.[12] Nor does prosecuting an accused once he attains competency implicate any Due Process violation.

Finally, common sense and the most basic notions of justice tell us that once a formerly incompetent criminal defendant attains competency, he may still be required to answer for his alleged crimes. The phrase "no *substantial* probability that he will attain competency" does not foreclose a possibility that he will attain competency; indeed, it implicitly reserves that possibility. And if and when a criminal defendant does attain competency, his victims may be entitled to pursue justice through the courts.[13]

In light of the foregoing, we hold that a trial court's dismissal of an indictment based on a finding that the defendant is incompetent to stand trial is not a dismissal "with prejudice" unless it is designated as such with the consent of the Commonwealth's attorney. Accordingly, we find that applying CR 41.02(3) to criminal cases by virtue of RCr 13.04 is unconstitutional as a violation of separation of powers principles. We therefore overrule *Taber* and *Hicks* insofar as they errone-

**12.** Unless, of course, doing so would violate the defendant's Constitutional right to, e.g., a speedy trial. *See Jackson v. Indiana*, 406 U.S. 715, 738, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972).

**13.** This is not to say, however, that the Commonwealth can require a criminal defendant found incompetent to stand trial to be indefinitely committed to a psychiatric hospital. In *Jackson*, 406 U.S. at 720, 92 S.Ct. 1845, the United States Supreme Court held that a state "cannot constitutionally commit the petition-

er [to a mental hospital] for an indefinite period simply on account of his incompetency to stand trial on the charges filed against him." In that case, an Indiana statute required a trial court to commit a defendant not competent to stand trial to a mental hospital until the hospital certified to the court that "the defendant is sane." *Id.* The Supreme Court found that this statute violated the Equal Protection and Due Process guarantees of the Fourteenth Amendment. *Id.* at 730–31, 92 S.Ct. 1845.

ously applied CR 41, 02(3) to criminal cases. We further hold that prosecution of a criminal defendant originally found incompetent to stand trial for his alleged crimes is permissible upon a subsequent finding of competency to stand trial, so long as the later prosecution does not violate the defendant's Constitutional rights.

■ Here, because the dismissal of the 2004 indictment was effectively *without* prejudice, it did not act as an adjudication upon the merits. Accordingly, double jeopardy and *res judicata* issues are inapposite. Neither has there been any allegation that Appellant's right to a speedy trial was violated, nor any allegation of prosecutorial misconduct. The Commonwealth was free to re-indict Appellant, and the trial court properly denied his motion to dismiss the 2008 indictment.

### B. The GBMI Jury Instructions

Appellant next argues that the trial court committed reversible error by tendering improper instructions to the jury. Specifically, he argues that this Court's pronouncements in *Brown v. Commonwealth,* 934 S.W.2d 242, 246 (Ky.1996) and *Star v. Commonwealth,* 313 S.W.3d 30, 35–37 (Ky.2010) require an instruction that a defendant found guilty but mentally ill (GBMI) "may or may not" receive treatment. Thus, he argues, the trial court's instruction that treatment "shall be provided" for a defendant found to be GBMI calls into question the constitutionality of the GBMI instruction altogether "as it will permit a jury to convict based on the false belief that a GBMI defendant will mandatorily receive treatment when it clearly is not the case."

The GBMI verdict is specifically provided for in KRS 504.120(4). To reach a GBMI verdict, the finder of fact must conclude that: "(a) The prosecution prove[d] beyond a reasonable doubt that the defendant is guilty of an offense; and (b) The defendant prove[d] by a preponderance of the evidence that he was mentally ill at the time of the offense.", KRS 504.130(1). If a defendant is found to be GBMI he is sentenced "in the same manner as a defendant found guilty" but not mentally ill; however, "treatment *shall be provided* the defendant until the treating professional determines that the treatment is no longer necessary or until expiration of his sentence, whichever occurs first." KRS 504.150(1) (emphasis added).

■ "An instruction in the language of a statute is proper if the statutory words are of clear and simple import and generally understood meaning." 2 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 485 (2d ed.1982) (emphasis added). *See also* 9A Wright & Miller at § 2556 (2d. ed.1995) ("[S]tatutory language is not sufficient *unless* its meaning and application to the facts are clear without any explanation."). Here, the statutory language is incapable of misunderstanding and requires no elaboration: "If the defendant is found guilty but mentally ill, treatment shall be provided . . . ." KRS 504.150(1). We therefore conclude that the trial court did not abuse its discretion by rejecting Appellant's proposed instructions indicating that a GBMI defendant "may or may not" receive treatment.

■ We pause, however, to address Appellant's argument that an instruction indicating "treatment shall be provided" to a GBMI defendant violates due process because "it will permit a jury to convict based on the false belief that a GBMI defendant will mandatorily receive treatment when it clearly is not the case." Essentially, Appellant is arguing that a jury may compromise its verdict—i.e., render a GBMI verdict rather than a verdict of Not Guilty by Reason of Insanity—based upon the mistaken belief that a

GBMI defendant will receive treatment. This compromise, he contends, violates due process principles. We find this argument to be without merit.

First, in *Star*, we considered—and rejected—this very argument. 313 S.W.3d at 36. Like the appellant in that case, Appellant here points us to no evidence supporting the proposition that GBMI verdicts increase the possibility of improper jury compromises. "To the contrary, the great weight of authority states that such verdicts do not lead to improper compromise verdicts." *Id.* (*citing People v. Smith*, 124 Ill.App.3d 805, 80 Ill.Dec. 310, 465 N.E.2d 101 (1984); *People v. Ramsey*, 422 Mich. 500, 375 N.W.2d 297 (1985); *Commonwealth v. Trill*, 374 Pa.Super. 549, 543 A.2d 1106 (1988); *State v. Neely*, 112 N.M. 702, 819 P.2d 249 (1991); *State v. Baker*, 440 N.W.2d 284 (S.D.1989)). Nor does Appellant explain how jury compromise is inconsistent with due process. Regardless, jury compromise in this case is speculative at best, and the verdict cannot be set aside on speculation. *See Dunn v. U.S.*, 284 U.S. 390, 394, 52 S.Ct. 189, 76 L.Ed. 356 (1932) ("That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters."). As we noted in *Star*, "[i]f Appellant believed that the jury improperly arrived at a compromise verdict, he was free to poll the jurors." 313 S.W.3d at 36.

Second, Appellant's reliance on this Court's decision in *Brown* is unpersuasive. 934 S.W.2d at 245–46. Our dicta in that case expressed concern with the continuing validity of the GBMI verdict if GBMI defendants do not actually receive treatment. However, the evidence presented to this Court in *Brown* was "so lacking [as to be] regrettable." *Id.* at 245. And the information the Court went beyond the record to include in its opinion provided equally unconvincing evidence of any funding shortage resulting in a failure to provide treatment to those found to be GBMI.[14] *See id.* In the end, although the Court indicated its belief that the appellant's proposed instructions, which included the "may or may not" language, appeared "more accurate," it nevertheless determined that the argument must fail on other grounds. Thus, Appellant's interpretation of *Brown*—i.e., as "hold[ing] that in order for a jury to be properly instructed concerning the effect of finding a defendant GBMI, that jury must be informed that there is no guarantee of treatment whilst in prison serving the GBMI sentence"—is simply inaccurate. We did not so "hold," and we repeatedly indicated that the evidence presented to the Court was too insubstantial to do so.

14. Specifically, the Court cited a 1996 House Resolution which would have created "'a task force to study the involuntary commitment and criminal responsibility laws in Kentucky,' directly acknowledg[ing] that 'a lack of adequate resources exists for persons with mental illness or mental retardation within the criminal justice system....'" *Id.* (quoting 1996 Kentucky House Concurrent Resolution No. 27). However, the Resolution died in committee.

It was this proposed Resolution which led the Court to believe "that the Legislature, with passage of KRS 504.120–.150, has put into place a system lacking in adequate funding, and has taken no positive measures to correct this deficiency, thus falling clearly in contravention of its own mandate for treatment of individuals found to be GBMI." *Id.* We fail to see how the legislature's decision to not fund a study exploring a potential lack of resources for GBMI defendants proves that a lack of resources exists. In fact, the legislature's decision to not fund the study is equally as susceptible to the exact opposite conclusion—that there was *no* evidence of a resources shortage, and therefore no reason to fund the study.

Nor did we so hold in *Star*. In that case, we simply noted that the jury instructions, which included an indication that a GBMI defendant "may or may not" receive treatment, "alleviate[d] any concerns expressed by this Court in *Brown*." 313 S.W.3d at 37. However, we neither renewed, nor commented on the continuing validity of, the *Brown* court's concerns.[15] Interestingly, the evidence presented to the *Star* court included an affidavit from a Deputy Warden in the Correctional Psychiatric Treatment Unit at the Kentucky State Reformatory. *Id.* at 35. While the Deputy Warden's testimony indicated that the GBMI verdict had "no impact on the classification process nor the psychiatric treatment provided," and that the Department of Corrections conducted "its own independent evaluation and ... provide[d] appropriate psychiatric care," she did *not* testify that treatment "may not be provided" to a GBMI defendant—for lack of proper funding or otherwise. *See id.* Indeed, her testimony seems to suggest exactly the opposite. *See id.*

Because Appellant relies solely on *Brown* and *Star* without introducing to this Court any further evidence of a resource shortage, and because the evidence in those cases did not support the argument that a GBMI defendant may not receive treatment, we cannot conclude that the GBMI verdict is unconstitutional. We note here that even if we were presented with substantial evidence that GBMI defendants may not receive treatment, it would not necessarily render the GBMI verdict unconstitutional. As noted, KRS 504.150 requires GBMI defendants receive treatment. While evidence that they may not receive treatment would certainly be troubling, it would indicate that the correctional or mental health facility is violating a Kentucky statute (and, likely, a court order), not that the verdict is constitutionally infirm.

For the foregoing reasons, we hold that the trial court did not abuse its discretion by instructing the jury that "treatment shall be provided" to a GBMI defendant. We further conclude that the GBMI verdict does not otherwise implicate a violation of Appellant's due process rights.

## C. Appellant's Competency Determination

Appellant next argues that the trial court committed reversible error in finding him competent to stand trial. Specifically, he alleges that the trial court's competency determination, based primarily upon Dr. Amy Trivette's evaluation of Appellant, was not supported by a preponderance of the evidence because two other,[16] more experienced[17] psychiatrists had determined Appellant to be incompetent to stand trial several years prior. Thus, he argues because he was incompetent, he was denied his substantive due process right to not be prosecuted. *Pate v. Robinson*, 383 U.S. 375, 378, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *Thompson v. Commonwealth*, 147 S.W.3d 22, 33 (Ky.2004).

15. Concerns which by the time *Star* was rendered were fourteen years old and are now sixteen years old.

16. Although Appellant's brief alleges that two doctors had previously evaluated him and concluded that he was incompetent to stand trial, only one, Dr. Sively, testified at the competency hearing.

17. At the time of the evaluation in 2006, Dr. Sively had been a licensed psychologist for approximately 45 years; he had been evaluating individuals accused of crimes for approximately fifteen years; and he had performed approximately 500 such evaluations. Dr. Trivette had been a licensed psychiatrist for approximately five years at the time of her evaluation.

"A competency determination is based on the preponderance of the evidence standard." *Chapman v. Commonwealth*, 265 S.W.3d 156, 174 (Ky.2007) (*citing Thompson*, 147 S.W.3d at 32). "We may disturb a trial court's competency determination only if the trial court's decision is clearly erroneous (*i.e.*, not supported by substantial evidence)." *Id.* (*citing Thompson*, 147 S.W.3d at 33).

KRS 504.060(4) provides: " 'Incompetency to stand trial' means, as a result of mental condition, lack of capacity to appreciate the nature and consequences of the proceedings against one or to participate rationally in one's own defense." Similarly, the United States Supreme Court has stated that the test for whether an individual is competent to stand trial is "whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). With this test in mind, we must determine whether substantial evidence supported the trial court's finding that Appellant was competent to stand trial.

Although Appellant had previously been found incompetent to stand trial for these charges on several occasions, our review is limited to the trial court's competency determination of September 17, 2009, and the evidence concerning Appellant's competency presented to that court two days earlier. That evidence was limited to the testimony of Dr. Richard Sively, a psychologist at the Kentucky Correctional Psychiatric Center (KCPC), and the testimony of Dr. Amy Trivette, a KCPC staff psychiatrist.

### 1. Dr. Sively's Testimony

Dr. Sively's testimony was based upon his evaluation of Appellant on June 20, 2006. On that date, Dr. Sively administered one test to Appellant—a symptom assessment test which he was required to administer orally because Appellant was unable to complete the test independently. This test revealed to Dr. Sively that although Appellant was "well-oriented as to time, place, and person," his "affect was inappropriately flat; a typical symptom of schizophrenia." He also testified that Appellant had admitted to a history of auditory hallucinations which were still prevalent, as well as an ability to communicate with animals. Dr. Sively asserted that Appellant's cognitive skills were less competent than they had been when he originally evaluated him in 2002 (concerning an unrelated matter). Specifically, he testified that his concentration skills were "markedly impaired." Based upon these results, Dr. Sively concluded that Appellant was "overtly psychotic and not competent to participate rationally in his own defense." [18] He further concluded that, based upon Appellant's history with mental illness, he was not likely to become competent in the near future.

### 2. Dr. Trivette's Testimony

Dr. Trivette's testimony was based upon her evaluation and treatment of Appellant from February 15, 2009 to May 8, 2009. During this period, she met with him at least twice a week for treatment purposes, and even more frequently than that for evaluation purposes toward the end of his stay at KCPC. She explained how she treated him "more aggressively with antipsychotic medication—meaning higher

---

**18.** In particular, Appellant's delusions were the reason Dr. Sively concluded he "could not participate rationally in his own defense—*at that time, I'm talking about 2006, of course.*"

(Emphasis added). It was Dr. Sively's opinion that a psychotic person that heard voices telling him that he was a superhero could not communicate rationally with his attorney.

doses and multiple medications in this case."[19] Dr. Trivette indicated that although Appellant exhibited irritability upon his original admission to KCPC, by the time he was released he was "very cooperative," spending lengthy periods of time with herself and other staff members without any difficulty. She attributed this improved cooperation to the medication.

Dr. Trivette administered tests specifically designed to evaluate Appellant's competency to stand trial. For example, she discussed the verdicts of Not Guilty by Reason of Insanity, and Guilty But Mentally 111 with Appellant, finding that he understood the consequences of both verdicts.

She also spoke to Appellant in general terms about the trial process, which revealed that Appellant understood the role of the judge and jury, the role of the prosecutor, and the differences between direct- and cross-examination. He further indicated that he understood that if he exercised his right to testify he would be required to submit to cross-examination by the prosecutor.

When asked by defense counsel whether Appellant would be able to sit through a trial that could potentially last "a couple of weeks," Dr. Trivette explained that with the proper medication, Appellant had been able to sit and speak with her rationally, maintaining attention for hours at a time. She further testified that long, uninterrupted periods could be difficult for Appellant, though with proper breaks he could tolerate a long trial.[20]

In addition to conducting her own psychiatric evaluation, Dr. Trivette: (1) referred Appellant to a KCPC psychologist for a psychological evaluation; (2) reviewed and considered records from previous institutions Appellant had been admitted to; and (3) reviewed and considered records from previous KCPC evaluations. While she was adamant that Appellant was intelligent enough to understand court proceedings, charges, defenses, and courtroom participants, any potential issues would involve being able to rationally assist in his own defense due to his psychosis. Ultimately, based upon Appellant's progress and response to medication, Dr. Trivette concluded that despite his psychosis, he could participate rationally in the proceedings and in his own defense.

### 3. The Trial Court's Competency Determination

Upon conclusion of the testimony at the competency hearing, the trial judge entered an oral finding that Appellant was competent to stand trial, opining that in his experience, "the last report . . . is usually the best." His written order indicated the same, stating that "the most recent evaluation is clear that [Appellant] is competent to stand trial, and this Court so finds."

We agree with the trial court that the preponderance of the evidence supported a finding that Appellant was competent to stand trial. Dr. Trivette's recommendation supporting a finding of competency was based upon her treat-

---

19. She testified to specific medications with which she treated Appellant, including two antipsychotic medications, one medication to prevent side-effects, and a mood-stabilizer that helps augment the effects of antipsychotic medications. She testified that Appellant had been prescribed some of the same medications in the past, but not at the same doses, and not in the same combinations.

20. Upon the trial court's inquiry as to how often Appellant would need a break in trial in order to maintain the proper level of attention, Dr. Trivette stated her belief that once every one-and-a-half to two hours would be sufficient.

ment and evaluation of Appellant which spanned a period of eighty-three days in 2009. During this period, she met with him at least twice a week, and even more frequently toward the end of the period for evaluation purposes. She altered his medication regimen, and he responded well. Finally, she reported her findings that Appellant was able to understand the proceedings and the charges against him, and to participate rationally in his defense.

On the other hand, Dr. Sively had not evaluated or even seen Appellant since 2006—more than three years prior to the competency hearing. Moreover, he had only met with Appellant on two occasions (the other being in 2002 on an unrelated matter). During his 2006 evaluation, Dr. Sively administered only one test upon which he based his finding that Appellant was, at that time, incompetent to stand trial. However, even Dr. Sively acknowledged that it is possible in a structured environment like KCPC for a patient to stabilize.

Based upon the evidence presented to the trial court at the competency hearing, we cannot conclude that its competency determination was clearly erroneous. There was substantial evidence to support a finding that Appellant was competent to stand trial as of September 15, 2009—the date of the hearing. Although Appellant may well have been incompetent to stand trial between 2004 and 2008, the substantial testimony offered by Dr. Trivette supported the conclusion reached by the trial court in 2009.

### D. Assault Under Extreme Emotional Disturbance

Appellant next argues that the trial court committed reversible error by failing to instruct the jury on the lesser included offense of assault under extreme emotional disturbance (hereinafter "EED") with re-spect to the assault on Morefield. Specifically, he argues that the jury could have reasonably found that, subjectively, due to his "extreme mental illness, lack of medication, and believing that he had been struck by a rock from Mr. Morefield's weed eater, his state of mind was so 'enraged, inflamed, or disturbed' as to overcome his judgment and cause him to 'act uncontrollably from the impelling force of the extreme emotional disturbance rather than from some evil or malicious purposes.' " (Citing *McClellan v. Commonwealth*, 715 S.W.2d 464, 468–69 (Ky.1986)).

 We review a trial court's decision not to instruct the jury on a lesser-included offense in accordance with two well-settled principles: (1) "it is the duty of the trial judge to prepare and give instructions on the whole law of the case . . . [including] instructions applicable to every state of the case deducible or supported to any extent by the testimony"; and (2) "although a defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury on proper instructions, the trial court should instruct as to lesser-included offenses only if, considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond a reasonable doubt that he is guilty of the lesser offense." *Holland v. Commonwealth*, 114 S.W.3d 792, 802 (Ky. 2003) (citations and internal quotation marks omitted).

 Appellant was indicted for the attempted murder of Dick Morefield. KRS 507.020, KRS 506.010. An exception to Kentucky's murder statute provides that an individual is not guilty of murder (or, by extension, attempted murder):

[I]f he acted under the influence of extreme emotional disturbance for which

there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be.

KRS 507.020(1)(a). As noted, the jury found Appellant guilty of the lesser included offense of first-degree assault.[21] KRS 508.010. He was entitled to an instruction of assault under EED if a rational trier of fact could reasonably conclude that he was acting under EED when he stabbed Morefield.

■ We defined EED in *McClellan v. Commonwealth,* where we stated:

Extreme emotional disturbance is a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or malicious purposes. It is not a mental disease in itself, and an enraged, inflamed, or disturbed emotional state does not constitute an extreme emotional disturbance unless there is a reasonable explanation or excuse therefore, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under circumstances as the defendant believed them to be.

715 S.W.2d at 468–69. The EED defense requires "adequate provocation" for the disturbance—that is, a "triggering event" that caused the EED. *See, e.g., Holland,* 114 S.W.3d at 807; *Springer v. Commonwealth,* 998 S.W.2d 439, 452 (Ky.1999).

The "triggering event" may include "the cumulative impact of a series of related events." *Fields v. Commonwealth,* 44 S.W.3d 355, 359 (Ky.2001) (*quoting* R. Lawson and W. Fortune, *Kentucky Criminal Law* § 8–3(b)(3), at 342 (*citing California v. Wharton,* 53 Cal.3d 522, 280 Cal. Rptr. 631, 809 P.2d 290 (1991))). Although the "triggering event" may or may not immediately precede the criminal act, it must be "sudden and uninterrupted." *Id.*

Because one's emotional response to a situation may dissipate over time, a subsidiary inquiry arises as to whether there intervened between the provocation and the resulting [assault] a cooling-off period of sufficient duration that the provocation should no longer be regarded as "adequate."

*Fields,* 44 S.W.3d at 359 (citation omitted).

■ There are two different versions of the facts we must consider to determine whether Appellant was entitled to an EED instruction. *Holland,* 114 S.W.3d at 802 (citations and internal quotation marks omitted) (stating that a trial court must instruct on "every state of the case deducible or supported *to any extent* by the testimony") (emphasis added). The first version of the facts comes from Morefield's trial testimony. He testified that on the date of the stabbing he had just completed yard work for an acquaintance and was putting his weed-eater in his truck when Appellant approached him and asked him if he could borrow a lighter. When Morefield reached toward his pocket for his lighter, Appellant grabbed Morefield's

---

**21.** Although Appellant relies on KRS 508.040 to argue that he was entitled to the EED instruction, that statute applies only to prosecutions under KRS 508.010 (first-degree assault), 508.020 (second-degree assault), or 508.030 (fourth-degree assault). Because Appellant was prosecuted for attempted murder, and not for assault, KRS 508.040 is inapplicable. However, the EED exception provided for in the murder statute applies equally to the inchoate crime of attempt. *See Holland v. Commonwealth,* 114 S.W.3d 792, 806 ("[A] defendant under the influence of EED who takes a substantial step towards killing a person with the intent to do so commits Attempted First–Degree Manslaughter.").

right shoulder and stabbed him in the chest. Appellant then walked away. Morefield testified he did not know Appellant, and had "never seen him before in [his] life." When asked on cross-examination if it was possible if Appellant had been there earlier that day, left, and then come back, Morefield answered "no."

The second version of facts comes from a taped interview of Appellant by law enforcement officers shortly after his arrest on May 29, 2004.[22] Appellant indicated that he walked by Morefield while he was weed-eating the lawn. The weed-eater cut Appellant in the leg,[23] and Appellant asked Morefield if he was going to apologize. Morefield responded: "no." Appellant did not indicate that this event angered or upset him in any way. He did not argue with or engage Morefield any further; rather, Appellant walked back to his house.

When he arrived home his grandfather was at his house. Appellant beckoned his grandfather to "come here," but his grandfather walked away without responding to Appellant. Appellant stated that at that point he "got mad and grabbed a knife." He then returned to Morefield's house and stabbed him in his chest. Morefield made no comment, and Appellant walked off.

■ With respect to Morefield's version of the facts, it is clear to us that no reasonable jury could conclude that Appellant was acting under EED. There appears to have been no triggering event whatsoever, much less one that a jury could conclude constituted "*adequate* provocation." The most that could be argued upon this set of facts is that Appellant's mental illness led him to stab Morefield. However, "the mere presence of mental illness, standing alone, does not constitute EED...." *Fields*, 44 S.W.3d at 359. Without a triggering event, an EED instruction is not warranted. *See id.*

With respect to the version of events elicited from Appellant's recorded interview, Appellant contends that it was "the cumulative impact of a series of related events," *Fields* 44 S.W.3d at 359, from which a reasonable jury could conclude that he was acting under EED. These events were: (1) his mental illness; (2) lack of medication;[24] and (3) believing he had been struck in the leg by Morefield's weed-eater. However, Appellant's statement to law enforcement indicated that it was the completely *unrelated* event of his grandfather ignoring him that provoked him to retrieve the knife, walk back to Morefield, and stab him. As noted, "adequate provocation" based upon the "cumulative impact" theory requires "a series of *related* events." *Id.* (emphasis added). It would require an exercise in mental gymnastics to find that this event was related to the weed-eater incident. Just because two events happen within a relatively short time-span does not make them "related" for purposes of adequate provocation.[25]

---

**22.** Before conducting the interview, the officers advised Appellant of his Fifth Amendment rights consistent with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Appellant signed a waiver indicating he had been made aware of these rights.

**23.** As previously mentioned, Appellant argues in his brief that the weed-eater hit a rock that in turn struck him; however, this is not what he told police.

**24.** Appellant's mother testified that, at the time of his crimes, Appellant was not receiving proper medication to treat his mental illness.

**25.** *See Holland*, 114 S.W.3d at 807–08 (holding that a reasonable jury could have found adequate provocation for an EED based upon the following series of events involving a broken relationship: (1) the victim's abandonment of the appellant during her recuperation from back surgery; (2) the victim's assault of

Over the years, an ocean of case law has been created with respect to the extreme emotional disturbance instruction. This Court has developed definitions and tests for EED designed to provide guidance to the courts of this Commonwealth with respect to what, precisely, constitutes "adequate provocation," a "triggering event," or a "series of related events." There is much wisdom in that ocean which should be heeded and drawn upon; but its waters are often difficult to navigate. With such a substantial body of case law devoted to the minutiae of this one instruction, it is easy to lose sight of what those definitions and tests were designed to determine: the presence of an *extreme emotional disturbance.* In this case, the only conclusion a reasonable jury could come to is that Appellant was acting under an improperly medicated severe mental illness—*not* an extreme emotional disturbance. We therefore hold that the trial court did not err by denying Appellant's request to instruct the jury on first-degree assault under EED.

**E. Denial of Appellant's Motion to Suppress Statements Given to Police**

■■ Appellant next argues that the trial court committed reversible error by failing to suppress post-arrest statements he offered to the police. Specifically, he contends that, due to the fact that he suffered from a mental illness causing hallucinations and delusions, any statement he made would be unreliable. Thus, he contends that his mental illness rendered his statements "involuntary" for Fifth Amend-

ment *Miranda* purposes. "When reviewing a trial court's denial of a motion to suppress, we utilize a clear error standard of review for factual findings and a *de novo* standard of review for conclusions of law." *Jackson v. Commonwealth,* 187 S.W.3d 300, 305 (Ky.2006) (*citing Welch v. Commonwealth,* 149 S.W.3d 407, 409 (Ky. 2004)).

■■ The Self–Incrimination Clause of the Fifth Amendment to the U.S. Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself. . . ." [26] This prohibition "not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'" *Minnesota v. Murphy,* 465 U.S. 420, 426, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984) (*quoting Lefkowitz v. Turley,* 414 U.S. 70, 77, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973)). Recognizing that police interrogation is often intended to elicit statements that can be used in later criminal proceedings, the U.S. Supreme Court crafted rules governing the admissibility of such statements in *Miranda v. Arizona,* 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Miranda* and its progeny are concerned primarily with guarding against statements obtained as a result of police overreaching, i.e., *coerced* confessions.[27]

the appellant; (3) the victim's subsequent abandonment of the appellant "when he asked her to shoot him in order to take him out of his 'misery'"; or (4) *"the cumulative effect of this series of events."*) (emphasis added).

26. The Fifth Amendment Self–Incrimination Clause applies to the states via the Fourteenth Amendment Due Process Clause. *Malloy v.*

*Hogan,* 378 U.S. 1, 10–11, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

27. Thirty years before *Miranda,* the U.S. Supreme Court recognized the problem of coerced confessions in *Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936). In that case, police extracted confessions by torturing the accused. Even though the Fifth Amendment had not yet been held to

 The U.S. Supreme Court has recognized that an accused's mental condition is a factor when determining the voluntariness of a confession. *See Colorado v. Connelly*, 479 U.S. 157, 163–64, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). However, "a defendant's mental condition, by itself and apart from its relation to official coercion," does not render a confession constitutionally involuntary. *Id.* at 164, 107 S.Ct. 515. "[T]he Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" *Id.* at 170, 107 S.Ct. 515 (*citing Oregon v. Elstad*, 470 U.S. 298, 305, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985)). Thus, although a defendant's mental illness can be considered in determining whether law enforcement coerced a confession—for example, by exploiting the mental illness as in *Blackburn v. Alabama*, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960) and *Bailey v. Commonwealth*, 194 S.W.3d 296 (Ky. 2006)—it is not, without some official coercion, sufficient for suppression purposes. *Connelly*, 479 U.S. at 170, 107 S.Ct. 515. However, in *Bailey*, this Court noted that official coercion is to be determined objectively: "we are not analyzing whether [Appellant] believed he was being coerced, but simply determining whether the officers' actions were objectively coercive *in light of* [Appellant's] mental deficiency." *Id.* at 302 n. 1.

Appellant argues that *Bailey* requires reversal in this case. He compares the police investigation in this case to that in *Bailey*, where we found "the techniques used to elicit the confession were coercive in light of [the appellant's] seriously deficient mental capacity...." 194 S.W.3d at 304. However, the facts in *Bailey are*

clearly distinguishable. For example, the appellant in that case was "mildly" mentally retarded and had an IQ of 50, which placed him at the bottom .07% of the population—he had the mental ability of a six-year-old child. *Id.* at 298. After denying any wrongdoing and declining to submit to a polygraph test, the police told the appellant in *Bailey* that if he refused to submit to the polygraph he would probably be arrested. *Id.* This caused the appellant to reluctantly submit to the test. *Id.*

Next, after the police read the appellant his *Miranda* rights:

> [H]e replied that he understood the right to remain silent as meaning "you are going to jail," and the right to a public defender as meaning "you are in trouble." When advised of his right to an attorney, [the appellant] inquired [as to] what "an atturnity" is. After about fifteen minutes of discussing his rights, [an officer] instructed [the appellant] to sign his name on the form.

*Id.* Our recitation of the facts in *Bailey* goes on to discuss a number of other investigatory tactics that were clearly objectively coercive under the totality of the circumstances. *Id.* at 304. The case before us does not present the same indicia of objectively coercive tactics.

 We note first that Appellant is a man of average intelligence, testing at an IQ of 95. He was read his *Miranda* rights before giving his statement to police. He acknowledged that he understood these rights and signed a waiver. We have thoroughly reviewed his audio-taped confession and conclude that there is absolutely no evidence of coercion, psychological or otherwise. While it may be true that, due to his mental illness and lack of medication, Appellant "was probably not able to make adequate judgment about what was going

apply to the states, the Court noted that such action was "revolting to the sense of justice."

*Id.* at 286, 56 S.Ct. 461.

on at the time of questioning," as Dr. Sively testified at trial, this is not enough to render his confession constitutionally involuntary. *See Connelly*, 479 U.S. at 164, 107 S.Ct. 515. There is no evidence that the police *exploited* his mental illness to obtain a confession.[28]

Appellant also cites the fact that he was "left alone in a small holding cell for several hours with an officer guarding the door, given no medication, had no visitors, and forced to sit for a portion of that time in clothes covered in his father's blood." These actions, he argues, in light of his mental illness, are objectively coercive. We cannot agree. First, an officer guarding the door of a mentally ill murder suspect is, we hope, standard procedure. Second, his mother testified that he had not been prescribed any medication at the time of the murder, so any inference that the police were *withholding* medication is misleading. Third, the testimony at the suppression hearing indicated that nobody attempted to visit Appellant while he was in the holding cell, and a lack of visitors is not indicative of official coercion.[29] Finally, there is no evidence that Appellant was "forced to sit ... in clothes covered in his father's blood." Rather, the suppression hearing testimony revealed only that when he arrived at the holding cell, Appellant was still wearing the clothes he had been wearing at the time of the murder.[30] Again, this is not indicative of official coercion.

■■■ " '[T]he central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence." *Id.* at 166, 107 S.Ct. 515 (*quoting Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). Accordingly, a voluntary confession by a mentally ill defendant is admissible at trial absent some indicia of official coercion. *See id.* at 164, 107 S.Ct. 515. However, without evidence that law enforcement officers exploited an accused's mental illness to obtain the confession, the exclusionary rule does not apply. *Id.* at 166–67, 107 S.Ct. 515.

Because there is no evidence that Appellant's confession was constitutionally involuntary, we hold that the trial court did not err in denying Appellant's motion to suppress his statements.

## F. Denial of Appellant's Motion to Sever the Murder Charge from the Attempted Murder Charge

Finally, Appellant argues that the trial court committed reversible error by denying his motion to sever the murder charge from the attempted murder charge. In doing so he contends that his stabbings of Morefield and Sam Keeling do not constitute part of a common scheme or plan, and therefore cannot, by rule, be charged in the same indictment. Additionally, he argues that the trial court's decision to deny the motion was based upon the Commonwealth's assurances that a law enforcement officer would testify that Appellant attacked Morefield as "practice" for the attack on his father, thus tying the two incidents together. However, the Com-

---

**28.** To the contrary, the audio-taped confession revealed that the investigating officers were very kind to, respectful of, and patient with Appellant.

**29.** In certain instances, we can imagine that depriving an accused suffering from mental illness of visitors may be indicative of psychological coercion. However, this case does not present that question.

**30.** While we can imagine certain instances where *forcing* an accused suffering from mental illness to wear blood-stained clothes during an interrogation could constitute psychological coercion, those are not the facts of this case.

monwealth never introduced this testimony, which rendered the denial of the motion to sever prejudicially erroneous.

RCr 6.18 provides, in pertinent part:

> Two (2) or more offenses ... may be charged in the same indictment ... in a separate count for each offense, if the offenses are of the same or similar character or are based on the same acts or transactions connected together or constituting parts of a common scheme or plan.

We review a decision to join or sever separate counts of an indictment for abuse of discretion. *Schambon v. Commonwealth*, 821 S.W.2d 804, 809 (Ky.1991) (*citing Russell v. Commonwealth*, 482 S.W.2d 584 (1972)). "[T]hat discretion will not be disturbed unless clear abuse and prejudice are shown." *Id.* "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999) (*citing* 5 Am.Jur.2d *Appellate Review* § 695 (1995)).

Appellant contends that "the charge of murder and the first degree assault charge were not based on the same set of circumstances and do not constitute part of a common scheme or plan." We disagree. First, we note that Appellant was not charged with assaulting Morefield; he was charged with attempting to murder him.[31] Second, the two offenses were indisputably "of the same or similar character." RCr 6.18. The crimes were committed less than two days apart, and both involved Appellant stabbing the victims in the chest with a knife. The only significant difference is that his father died from the wounds.[32] Additionally, Appellant asserted the insanity defense for both charges based upon one mental condition. Thus, Appellant's assertion that "the facts and potential defenses of each case are so fundamentally different that the jurors ... may be so confused by the combination of evidence that they would not be able to render a fair verdict" is simply incorrect. The facts are very similar, and the insanity defenses are identical. We also note, as did the trial court, that evidence that Appellant had stabbed a man in the chest less than two days before he stabbed his father in the chest would tend to disprove his self-defense claim.

One additional piece of evidence connects these two crimes. Appellant told Dr. Trivette that the day before the murder he had seen his father talking to Morefield. This allegedly led Appellant to believe that his father was involved with Morefield's stabbing. (Appellant had previously recanted on his confession to stabbing Morefield during his prior hospitalization while incompetent to stand trial.) That evening, Appellant and his father argued, and he believed that his father was "setting him up to go to the penitentiary." His father allegedly asked Appellant to admit to murdering Morefield, and if he did not admit to it that his father would blame him for it anyway. This testimony, if introduced, would have provided a motive for Appellant to kill his father, inextricably linking the two crimes.

We do, however, find it somewhat troubling that part of the impetus for the trial court's decision to deny the motion to sev-

---

**31.** Of course, the jury was instructed on the lesser included offense of first-degree assault of which it ultimately found him guilty but mentally ill.

**32.** Appellant attempts to distinguish the crimes by arguing that "patricide ... is fundamentally different than the attempted murder ... of a complete stranger." The crime, however, is murder; the law is not concerned with the familial relation or nonrelation of the victim.

er was based upon the Commonwealth's representation that it intended to introduce evidence that Appellant told police he stabbed Morefield as "practice" for killing his father. Specifically, the trial court stated: "If the stabbing of separate individuals in the chest within two days is not a signature crime, then the Defendant's statement that he was practicing would allow proof of the events of Count II to be introduced in Count I." However, the Commonwealth failed to introduce this evidence at trial because it could not "track down" the officer who had allegedly reported it. Although this evidence would have provided an unquestionable link between the two crimes, we believe that there was otherwise sufficient evidence supporting a "common scheme or plan," or that the crimes are "of the same or similar character" to justify trying the charges jointly.

Indeed, the trial court's decision to deny Appellant's motion to sever was not based solely on the Commonwealth's intention to introduce Appellant's alleged statement that he stabbed Morefield as "practice" for his father. First, the trial court did not rule out the "signature crime" possibility. Second, the trial court noted the close temporal relationship between the two crimes, and that "the fact that the Defendant attacked a random stranger two days before he murdered his father should be admissible to attacking his self defense claim. The probative value and admission of this type of conduct would certainly outweigh any prejudicial value." Joinder was therefore permissible under RCr 6.18.

However, even when joinder is permissible under RCr 6.18, if it appears that a defendant or the Commonwealth "will be prejudiced by a joinder of offenses ... the trial court shall order separate trials of counts ... or provide whatever other relief justice requires." RCr 9.16. In assessing whether joinder for trial is prejudicial, we have typically asked "whether evidence necessary to prove each offense would have been admissible in a separate trial of the other." *Roark v. Commonwealth*, 90 S.W.3d 24, 28 (Ky.2002). If so, then the evidentiary objection to joinder, at least, has been deemed answered.

Applying that test here, there was evidence that Appellant's father knew about Reeling's attack on Morefield and that the Morefield incident may have borne on Appellant's motive for attacking his father. Specifically, as previously noted, Appellant's belief that his father was setting him up to go to the penitentiary by implicating him in Morefield's stabbing provides a potential motive for Appellant to murder his father. Evidence of the Morefield incident would thus have been admissible in a separate murder trial under KRE 404(b)(1)'s exception for evidence offered "as a proof of motive."

Similarly, Dr. Trivette, testifying at trial that in her opinion Appellant was sane at the time of both incidents, placed considerable emphasis on the fact that immediately after the murder of his father Appellant fled the scene and hid the murder weapon, actions which, in her opinion, indicated that Appellant appreciated the wrongfulness of *both* stabbings. Several courts have held that where sanity is at issue, collateral acts bearing on that issue also come within the KRE 404(b)(1) exception for evidence relevant for "some other purpose" than proving the defendant's character. *See, e.g., Vermont v. Prior*, 174 Vt. 49, 804 A.2d 770 (2002); *Arizona v. Hurles*, 185 Ariz. 199, 914 P.2d 1291 (1996); *Shepherd v. Indiana*, 547 N.E.2d 839 (Ind.1989). Evidence of the murder and Appellant's subsequent conduct in fleeing and hiding the weapon, therefore, would have been admissible as evidence bearing on sanity in a separate trial of the Morefield assault. Because the two incidents would have been mutually admissible

in separate trials, the joint trial was not unduly prejudicial under RCr 9.16.

In sum, we conclude that denying the motion to sever does not constitute an abuse of discretion. There was sufficient evidence of a "common scheme or plan," and that the crimes were "of the same or similar character." We further conclude that the joinder of the charges was not unduly prejudicial under RCr 9.16. Accordingly, the trial court's decision cannot fairly be described as "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English*, 993 S.W.2d at 945 (*citing* 5 Am.Jur.2d *Appellate Review* § 695 (1995)).

### III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

All sitting. All concur.