Barbara Ann SCHAMBON, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

Floyd SCHAMBON, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

Nos. 90–SC–587–MR, 90–SC–588–MR.

Supreme Court of Kentucky.

Dec. 19, 1991.

Barbara M. Holthaus, Asst. Public Advocate, Dept. of Public Advocacy, Frankfort, for appellants.

Frederic J. Cowan, Atty. Gen., Michael L. Harned, Asst. Atty. Gen., Criminal Appellate Div., Frankfort, for appellee.

LAMBERT, Justice.

Appellants were convicted of eight counts of first degree sodomy, three counts of first degree criminal abuse, twenty-one counts of second degree sodomy, and twenty-eight counts of second degree cruelty to animals. Appellant Barbara Schambon was also convicted of one count of incest. Both were sentenced to a total of eighty-five years in prison and appeal as a matter of right.

In June of 1989, the Warren County Animal Shelter was informed of the presence of animals in a garage. The animals were without food or water and the garage was without any ventilation. The shelter's employees contacted the county dog warden who, accompanied by a deputy sheriff, investigated the complaint. Upon arriving at the location, they noticed a strong dog feces odor coming from the house. The warden then walked to the detached garage. Upon opening the door, he noticed chain link pens containing some seventeen to twenty-three poodles, Yorkshire terriers, and Pomeranians. The garage was not ventilated and the temperature was in excess of ninety degrees. The floor was covered with three to five inches of dog feces,

no dog food was noticeable and the water dish was empty. In one of the pens, a poodle was eating the remains of a Pomeranian. The warden reported that the stench was "overpowering." The two officials removed the dogs from the garage. After loading the dogs into a truck, the warden returned to the animal shelter while the deputy remained to investigate the situation.

After loading the dogs into the warden's truck, the deputy talked to several neighbors who had gathered to observe the situation. The deputy attempted to locate the owners of the house. One of the neighbors told him that the children who lived in the house were across the street at their babysitter's home. The deputy went to the house and spoke to the sitter, but the sitter would not let him talk to the children. However, one of the children overheard the deputy's inquiries and volunteered that her mother was in the house across the street. The girl left the babysitter and went across the street and crawled in a window. A few minutes later, appellant Barbara Schambon appeared at the front door.

The deputy informed appellant that he and the warden had removed the dogs from the garage. Appellant told the deputy that if he walked around to the back, she would talk to him inside the house. When the deputy entered the house, he noticed that two walls were lined with cages containing cats. He observed that the litter boxes were overflowing with feces. He also could hear additional animals barking and crying. While in the kitchen, he saw a badly decomposed Pomeranian lying on the floor in its bodily fluids. Dirty dishes and pots and pans were scattered around the kitchen and the stove was "alive" and "growing" with fungus and moss. A Guinea pig was sitting in a cage on the kitchen counter.

Upon being questioned, appellant maintained that the dogs had been fed and watered. She stated that the animals belonged to her husband and that she had told him to take care of them. She admitted that they had not been groomed. The deputy went outside the house in an effort

to avoid becoming nauseated, and upon his refusal to re-enter the house, appellant slammed the door. The deputy left the premises.

After the dog warden returned the dogs to the animal shelter, he obtained a search warrant for the house. Later that afternoon, the warden, the animal shelter manager, and the deputy returned to the house. When they arrived, appellant Floyd Schambon was standing in the driveway. He was arrested for cruelty to animals. Upon searching the house, the officials noted that dog feces was everywhere, including the walls and the beds.

While the authorities were searching the house, the four children returned from the babysitter's. The children were C.S., a son age thirteen; E.S., a daughter age ten; A.S., a daughter age eight, and R.S., a son age five. While the deputy talked to the children, appellant Barbara yelled and ordered them not to talk to anyone. She informed the deputy that he had no right to talk to her children and that she would contact her attorney and sue him.

After the animals were taken to the shelter, the staff cleaned and treated them. Most of the dogs had to be sheared because their hair was completely matted with feces. One poodle was so badly matted that it had to be sedated before it could be sheared. Most of the dogs were underweight and infested with lice and fleas. Many of the dogs had ear, eye and penis infections. Several of the dogs had parvo and distemper. One Pomeranian puppy died from parvo within an hour of arrival at the shelter and a poodle died from distemper the following week. Other dogs had mange and ringworm. A Yorkshire terrier had toenails an inch and a half long and one gave birth to puppies at the shelter. Both puppies died immediately after birth.

Due to the unsanitary conditions of appellants' house, the children were removed pursuant to an emergency custody order and placed in foster homes. The two boys were placed in the foster care of Mr. and Mrs. Bobby Bright while the two girls were placed in another foster home.

The Brights noticed that the younger boy, R.S., while in foster care, did not have good bathing habits and required assistance and training in the bathroom. They also noticed that he was terrified to go into the bathroom. When questioned about his fear, he responded that he was "afraid to go into the bathroom because you'll be there," and "you might hurt me." The Brights also noticed that R.S. had a bedwetting disorder. In an attempt to correct the disorder, the Brights would awaken the child during the night so he could use the bathroom. Upon entering the bathroom, the child would climb onto the toilet, then up to the sink where he would blankly stare at his foster parents.

The Brights also noticed that R.S. had severe apprehensions of adults. Specifically, he would not allow Mr. Bright to hold his hand while crossing the street and was extremely apprehensive near public restrooms. Upon questioning, R.S. informed the Brights of sexual improprieties involving appellants and other persons. The Brights notified the Cabinet for Human Resources (CHR) who conducted several interviews with the four children. Based on this investigation, appellants were indicted for various sexual and physical abuse crimes involving the children.

At trial, R.S., then six years old, testified that both appellants forced him to engage in deviate sexual intercourse. Specifically, he stated that Barbara placed her mouth on his "privates" "a whole lot" and that she had him place his mouth on her "privates" "more than ten times." R.S. stated that "a whole lot" constituted nine times. He also stated that Barbara forced him to engage in anal sex with her more than five times.

R.S. further testified that both appellants handled his penis and that he touched Floyd's penis. He also testified that Floyd performed oral sex on him, that he performed oral sex on Floyd, and that he placed his penis in Floyd's anus. R.S. stated that these activities occurred at night when Floyd would awaken him, take him into the bathroom, and have him climb onto the sink so that their bodies would be at the same height. At this time, they per-

formed sexual activities on each other, including, but not limited to anal sex.

Additionally, R.S. testified that Floyd took him to a park to meet men and women "by a tree." At the park, appellant would tie him up with a rope and force him to perform oral sex on men and women and allow the men to perform anal sex on him. He testified that he was "afraid" of these people and that he would ask them to stop. He also testified that at times his anus bled and that sometimes the people would give his father money.

In addition to the above testimony, R.S. testified that appellants took pictures and made movies of him naked and, while filming him, Barbara would have him say "bad words." He also stated that Barbara spanked him with "her hand and a belt" and Floyd with a "horse whip and a little bitty whip." He also testified that after he had been placed in foster care Barbara warned him not to talk about their sexual activities and threatened to harm him if he discussed them.

The thirteen-year-old boy, C.S., was hesitant and evasive in his testimony. He admitted, however, that Floyd chased the children with a horse whip and that appellants and the children walked around the house naked. When asked directly about his sexual contact with appellants, C.S. would only give vague answers. As a result, the trial court allowed the Commonwealth to question him about a report he had written detailing his sexual contacts with appellants and question him concerning statements he made to Detective Bill Jenkins.

In this report, C.S. wrote that as a form of punishment, Floyd sometimes hit him on his penis. He further wrote that the two "usually put our penises in each other mouths, sometimes we put our penises up our butts, we suck penises, put penises up each other's butts, and we suck other people's for money." In his interview with the detective, C.S. stated that he and Floyd had engaged in oral and anal sex. He also stated that Floyd had taken him to a park to meet another guy to have sex "lots of times."

C.S.'s written report also detailed sexual activities with Barbara. In the report he wrote, "I put my penis up her private or butt, and I sometimes suck her private." C.S. additionally told the detective that he and Barbara had oral sex, sexual intercourse and anal sex.

After receiving directed verdicts on numerous counts, both appellants were convicted and sentenced to eighty-five years in prison. They now appeal.

## I. CLAIMS OF ERROR

On appeal, appellants claim that the trial court's joinder of offenses and parties deprived them of their due process rights. They also claim that an error in the Commonwealth's bill of particulars deprived them of due process. Appellants further contend that the Commonwealth made improper arguments during summation which constituted prosecutorial misconduct and that it was error to allow the Commonwealth to amend the indictment at the close of its case in chief. Additionally, appellants claim they were denied due process by the admission of a victim's prior statement which they claim was a prior consistent statement. They also contend that a fair trial was denied by the admission of impermissible hearsay testimony of a foster parent and inadmissible prior bad acts. Appellants' last claim of error is that they were entitled to a directed verdict of acquittal because there was insufficient evidence to sustain both the sexual charges and the criminal abuse charges.

## II. SEVERANCE

(a) Appellants contend that the trial court erred when it declined to sever the animal cruelty charges from the sexual abuse charges.

RCr 6.18 permits the joinder of two or more offenses in the same indictment if the offenses are of the same or similar character or based on the same acts or transactions connected together or constitute parts of a common scheme or plan. Additionally, RCr 9.12 permits two or more indictments to be consolidated for trial if those offenses

could have been joined in a single indictment.

Joinder is inappropriate, however, when it appears that a party or the Commonwealth will be prejudiced by the joinder of offenses or of parties in a single indictment. RCr 9.16. If a party will be prejudiced, the trial court must order separate trials of counts or defendants or provide whatever other relief justice requires. The decision to join or sever is within the sound discretion of the trial court and an exercise of that discretion will not be disturbed unless clear abuse and prejudice are shown. *Russell v. Commonwealth*, Ky., 482 S.W.2d 584 (1972).

In the case at bar, appellants filed a pre-trial motion to sever the animal offenses from the sex offenses. After conducting a hearing on the motion, the trial court found that the offenses were intertwined and that the evidence of animal cruelty was essential to establish the physical abuse offenses and, as such, joinder was appropriate. In reaching this decision, the trial court noted that the circumstances of animal cruelty actually led to the criminal abuse and sex charges and that appellants' mistreatment of the animals reflected upon their state of mind when they committed the physical and sexual abuse.

To convict appellants of criminal abuse, it was necessary to prove that the environment in which the children lived subjected them to a risk of physical injury. This proof included testimony as to the deplorable conditions in the house and garage, specifically, the presence of diseased cats, dogs and other animals in the house and garage. Additionally, proof of the presence of animal feces and the carcasses of dead animals in the house was presented. This same proof was used to prove the animal cruelty charges. The record revealed that the trial court thoroughly contemplated the possibility of prejudice before ruling on the motion. There was no abuse of discretion.

(b) Appellants also contend that it was error for the trial court to refuse to try them separately. We reiterate that RCr 9.16 provides for separate trials only upon a showing of prejudice to the complaining party. In applying this rule, the trial court has broad discretion and an exercise of that discretion will not be overturned absent a clear showing of abuse. *Epperson v. Commonwealth*, Ky., 809 S.W.2d 835 (1990).

Appellants' base their claim here on the theory that, excluding the animal cruelty charges, none of the evidence admitted against one of them would have been admissible against the other. As a result, it is contended that both were prejudiced by the admission of the evidence relating to the other.

Although appellants' contention as to the admissibility of evidence in separate trials may be correct, there was no showing that the jury could not distinguish the evidence relevant to each appellant, resulting in unfair prejudice. *United States v. Benton*, 852 F.2d 1456, 1469 (6th Cir.1988). (See also *Ware v. Commonwealth*, Ky., 537 S.W.2d 174 (1976)). Appellants have not shown that the jury could not "individualize each defendant in relation to the mass [of evidence]." *Kotteakos v. U.S.*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

(c) Appellants also claim that the Commonwealth's bill of particulars misled them as to what crimes they were defending against and, as such, violated their right to due process. From a plain reading of the document, it appears that some of the charges were misnamed, but appellants were put on unmistakable notice that they would be required to defend against charges arising out of "deviate sexual intercourse." Their conduct was particularly described. Appellants' defenses to the charges were complete denials. As such, their defenses would not have been any different if the bill of particulars had been flawless. *Howard v. Commonwealth*, Ky., 554 S.W.2d 375 (1977). Appellants could not have been misled or prejudiced in their defenses. *Id.*

### III. AMENDMENT OF INDICTMENTS

Appellants further claim error when the trial court allowed the Commonwealth

to amend its indictments at the close of its case in chief. The applicable rule, RCr 6.16, is a lenient rule which provides for the amendment of an indictment at any time before the verdict and upon a finding that no additional or different offense has been charged and that the substantial rights of the defendant are not prejudiced.

The amendment allowed did not result in appellants being charged with a different offense. To the contrary, the amendment merely altered the designation of the subsection of the statute under which appellants were charged. The offense was the same. No additional evidence was required to prove the amended offense and appellants have not shown that they were prejudiced by the amendment. There was no error.

## IV. INTRODUCTION OF TAPED INTERVIEW

■ A more difficult question is appellants' complaint that the Commonwealth was improperly permitted to introduce a tape recorded interview with C.S., one of the victims, on grounds that the prior statement was not inconsistent. The Commonwealth disputes this and maintains that the prior statement was, indeed, inconsistent and, therefore, admissible.

Appellants readily admit that C.S. initially denied sexual contact with either appellant. They claim, however, that when he was confronted with the existence of the tape recorded interview, he recanted his denial and adopted its contents. As such, they claim that playing the recording for the jury constituted an inadmissible use of a prior consistent statement.

From the record, it appears that after being confronted with the existence of his prior statement, C.S. continued to be hesitant and evasive in his testimony and, at times, denied the veracity of the statement. Whether the child's prior statement was inconsistent with his testimony at trial was hotly disputed and thoroughly considered by the trial court which determined it to be inconsistent.

In view of the ambiguity of this child's testimony and the nuances associated with

it, and in recognition that the trial court was in the best position to make the determination, we discover no error in the trial court's ruling on this issue.

## V. HEARSAY

(a) Foster Parent.

■ Appellants maintain that the testimony of the foster parent, Mr. Bright, constituted inadmissible hearsay, was inflammatory, and served to unfairly bolster R.S.'s testimony.

On direct examination, Mr. Bright was permitted to testify concerning the behavior and conduct of R.S. after his removal from appellants' home. He testified that R.S. was terrified of bathrooms, hesitant about physical contact, spoke of "games in the shower," and had a habit of crawling upon the sink when taken into the bathroom. Appellants claim that Bright's "behavior and conduct" testimony merely bolstered R.S.'s testimony and that it constitutes nonverbal hearsay as it was offered to prove that R.S. was forced to engage in various forms of sexual conduct with appellants and others.

In overruling the objection to the testimony, the trial court stated that throughout cross examination appellants had attempted to show that R.S.'s older brother ("C.S.") had "planted" the vivid sexual contact allegations in the child's mind and that third parties who had conferred with him had influenced his terminology and the content of the allegations. The Court held that the Bright testimony was offered to discredit this defense theory and to show that R.S. behaved in a manner consistent with abuse prior to the time the allegations were made.

■ The testimony in question did not constitute nonverbal hearsay or any hearsay. The purpose of the testimony was to dispel the defense theory that the sexual contact allegations were manufactured by the older brother and the social workers. Our law is that once a witness's credibility has been attacked by charges of recent fabrication or improper influence, rebuttal

evidence may be introduced to show that the witness made a prior consistent statement at a time when there was no improper influence or motive to fabricate. *Eubank v. Commonwealth*, 210 Ky. 150, 275 S.W. 630 (1925).

This rule is applicable in the instant case. On cross examination, appellants pursued a theory that the allegations had been manufactured in the victim's mind by third parties. This theory was promoted by an attack on R.S.'s credibility and by accusations that he fabricated his stories. Appellants' cross examination provided ample grounds for the admission of Bright's testimony. *Reed v. Commonwealth*, Ky., 738 S.W.2d 818 (1987).

(b) Christine Schambon.

█ Finally, appellants claim that it was error to admit the testimony of Christine Schambon as to their nudity habits and punishment techniques on grounds that this constitutes inadmissible prior bad acts testimony. This claim is unpreserved but will be reviewed under the standard in RCr 10.26.

Christine, appellants' emancipated eighteen-year-old daughter, was permitted to testify concerning the living conditions in the house, her domestic duties while residing there, appellants' discipline methods, and appellant Barbara's habit of walking around the house nude and touching her vaginal area.

The general rule in Kentucky admits "evidence that reveals an independent criminal act by an accused ... if the independent crime is so interwoven with evidence of the crime charged that its mention is both necessary and appropriate." *Stanford v. Commonwealth*, Ky., 793 S.W.2d 112 (1990). This rule further provides that "all evidence which is pertinent to the issue and tends to prove the crime charged against the accused is admissible, although it may also prove or tend to prove commission of other crimes by him or to establish collateral facts. The fact that it may tend to prejudice the accused in the minds of the jurors is not a ground for its exclusion."

*Jones v. Commonwealth*, Ky., 554 S.W.2d 363 (1977).

In the instant case, Christine Schambon's testimony regarding the sanitary conditions of the house, nudity habits of appellant, and appellants' methods of discipline were interwoven with the Commonwealth's proof of the physical and sexual abuse charges and may have rendered the evidence admissible despite the fact that it tended to prove collateral uncharged criminal conduct. *Stanford v. Commonwealth*, supra 793 S.W.2d at 117. Christine's testimony may also have been pertinent to the physical and sexual abuse charges and established a course of conduct involving physical and sexual abuse of the children. *Jones v. Commonwealth*, supra, 554 S.W.2d at 367.

As there was no objection, we need not determine whether every word or phrase from Christine was properly admitted. It is sufficient to conclude that her testimony did not constitute palpable error. RCr 10.26.

## CONCLUSION

Upon review of appellants' convictions, this Court has addressed every contention with any possible merit. We have omitted appellants' absurd contentions that they were entitled to a directed verdict of acquittal and omitted unpreserved contentions of prosecutorial misconduct during summation on the firm conviction that it did not amount to palpable error. The judgments of the trial court are affirmed.

All concur.