# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.



Supreme Court of Kentucky

2014-SC-000466-MR

KEVIN HIGGINS

APPELLANT

V.

ON APPEAL FROM LINCOLN CIRCUIT COURT
HONORABLE DAVID A. TAPP, JUDGE
NOS. 13-CR-00065 AND 13-CR-00071

COMMONWEALTH OF KENTUCKY

APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**AFFIRMING AND REMANDING**

Kevin Higgins appeals as a matter of right from a judgment of the Lincoln Circuit Court sentencing him to life imprisonment for first-degree rape, two counts of first-degree burglary, and two counts of theft by unlawful taking, value $500.00 or more. Ky. Const. § 110(2)(b). Higgins raises four issues on appeal: 1) the joinder of his two indictments was improper; 2) the trial court erred when it refused to declare a mistrial following a juror's contact with a family member of a witness; 3) the trial court erred in sentencing Higgins to three consecutive life sentences, to run consecutively to a five-year sentence for which Higgins was incarcerated at the time of trial; and 4) the Commonwealth's statements during closing argument constituted palpable error. For the following reasons, we affirm the judgment and sentence of the Lincoln Circuit Court, but remand for entry of a corrected judgment consistent with the trial court's stated intent.

## FACTS AND PROCEDURAL HISTORY

During the evening of June 14, 2013, Nancy was at home alone when Higgins arrived at her residence and rang her doorbell.[1] Higgins requested to enter the home, ostensibly to use the telephone, but was refused entry. Subsequently, Higgins forced the front door open and locked it behind him. Inside the home, Higgins raped Nancy and stole twenty-eight dollars. Prior to leaving, Higgins threatened to return and kill Nancy if she informed the authorities about his crimes. Due to injuries sustained during the rape, Nancy was bleeding profusely, necessitating medical attention. Nancy contacted 911 to receive medical assistance at approximately 11:00 p.m. After being transported to the hospital, Nancy underwent surgery to close lacerations in her vagina. As part of her examination at the hospital, a rape kit was collected.

The following morning at approximately 10:18 a.m., Officer Harold Timothy Morris of the Stanford City Police Department (SCPD) was dispatched to investigate a report of a residential burglary at the Blanton residence located at 1117 Star Avenue. During the previous evening, the Blanton family had fallen asleep in their living room. Upon waking, Kathy Blanton went to her bedroom and noticed that her jewelry box had been rifled through. Her daughter, Ashley Blanton, went into her brother's room and discovered Higgins sleeping in the bed. Higgins was a stranger to the Blanton family, who

---

[1] Higgins arrived at Nancy's residence between 10:20 p.m. and 11:00 p.m. At trial, Lisa Dolin, the granddaughter of Nancy, testified that she had visited Nancy that night and left the home between 10:20 p.m. and 10:30 p.m.

2

responded to his presence in the home by alerting the authorities. After receiving the burglary report, Officer Morris arrived and woke Higgins.

Confronting Higgins, Officer Morris discovered that he was in possession of a kitchen knife. Officer Morris further observed that Higgins's clothes had blood on them. After placing him under arrest, Officer Morris also discovered that Higgins had jewelry in the pockets of his clothes, jewelry later confirmed to be Kathy Blanton's. Outside the residence, the police located a stool beneath Ashley Blanton's bedroom window, along with a hoodie that contained a stolen GPS device which belonged to Kevin Watson.

Inside Ashley Blanton's room, police found the window screen on the floor and a stick that Higgins had presumably used to pry open the window screen and obtain entry into the home. Also in the room, were shoes and a hat which belonged to Higgins. Additionally, police located a stolen cell phone and charging cords which belonged to Shannon Watson. Police made contact with Shannon Watson who confirmed to police that three vehicles belonging to her and her husband had been broken into near their residence early that morning.[2]

After being placed under arrest, Higgins made a recorded statement to the police in which he admitted to getting drunk at his uncle's residence the previous evening. He was not able to explain where the jewelry found in his pockets came from. While he initially told police that he thought the jewelry

---

[2] Watson later provided to prosecutors Higgins's identification card which she found in the yard near where her cars had been parked.

might have been given to him by his father, he later alleged that he had been set up. Additionally, Higgins denied prying open the window to the Blanton residence, saying that the window was already open. He denied ownership of the hoodie and claimed to have no knowledge of the stolen property contained inside it. Further, he denied committing a rape the previous evening.

When Higgins was taken into custody, investigators took samples of his DNA (including taking a swab of blood which was located on his penis) to prepare a biological identification kit. Both Higgins's biological identification kit and the rape kit collected from Nancy were analyzed by the Kentucky State Police lab. Their forensic examination concluded that the blood on Higgins's penis matched the DNA of Nancy at 15 loci, resulting in the estimated DNA profile for that match being 1 in 16 quintillion.

After receiving the DNA results, Detective Barry Allen of the SCPD contacted Nancy. He showed her a photograph of Higgins, whom she identified as the man who had raped her. Additionally, police conducted a canvas of the neighborhood, speaking to Nancy's neighbors about what they saw that evening. Gary Manning who lived two houses away from Nancy stated that he saw Higgins that night at approximately 10 p.m. Also, Alice Bolin, Nancy's neighbor recalled an African American man walking towards her house that evening.

Higgins was charged with first-degree rape, first-degree burglary, and two counts of persistent felony offender (PFO) in the first degree under indictment number 13-CR-0071. He was also charged with first-degree burglary, two

4

counts of theft by unlawful taking (value $500.00 or more), and three counts of being a PFO in the first degree under indictment number 13-CR-0065. Prior to trial the Commonwealth was granted permission, over Higgins's objection, to consolidate the two indictments into one case.

A Lincoln County jury found Higgins guilty of the charged offenses and recommended a sentence of life for first-degree rape; twenty years for each count of first-degree burglary enhanced by the PFO to life imprisonment; and five years for each count of theft by unlawful taking, value $500.00 or more, enhanced by the PFO to 10 years.[3] The jury further recommended that the sentences be served consecutively to each other. The trial court's judgment sentenced Higgins to life imprisonment and that sentence was orally ordered to run consecutively to Higgins's pre-existing five-year sentence. Higgins now appeals as a matter of right.

## ANALYSIS

### I. The Trial Court Did Not Err in Granting the Commonwealth's Motion to Join Higgins's Two Indictments.

Higgins first claims that the trial court abused its discretion and committed reversible error by granting the Commonwealth's motion to join Higgins's two indictments. Specifically, Higgins alleges that there was an

---

[3] During the penalty phase three counts of Persistent Felony Offender in the first degree were submitted to the jury. The jury found Higgins to be a persistent felony offender on each count. The charge of Persistent Felony Offender acts as a sentence enhancer to other eligible charges present in the indictment. The use of multiple persistent felony offender charges does not offer any further enhancement, rather it is needlessly duplicative. While the inclusion of the multiple persistent felony offender counts was not error in this case, we caution the Commonwealth concerning this practice, to avoid unnecessary confusion and error.

5

insufficient relationship between the offenses to permit them to be joined, due to the offenses not being based on the same acts or transactions and their occurring at different locations and times.[4]

Kentucky Rule of Criminal Procedure (RCr) 6.18 permits the joinder of offenses in separate counts of an indictment on condition that the offenses are of "the same or similar character or are based on the same acts or transactions connected together or constituting parts of a common scheme or plan." However, RCr 8.31 serves to limit the ability to join defendants or charges, requiring that a trial court "grant separate trials of defendants or provide whatever other relief justice requires" if either the defendant or the Commonwealth is prejudiced by joinder.[5] Prejudice in this context constitutes that which is "unnecessarily or unreasonably hurtful." *Romans v. Commonwealth*, 547 S.W.2d 128, 131 (Ky. 1977).

We review the trial court's decision to join or sever separate counts of an indictment under an abuse of discretion standard. *Hedgepath v. Commonwealth*, 441 S.W.3d 119, 131 (Ky. 2014) (citing *Hammond v. Commonwealth*, 366 S.W.3d 425, 429 (Ky. 2012). "[T]hat discretion will not be disturbed unless clear abuse and prejudice are shown." *Keeling v. Commonwealth*, 381 S.W.3d 248, 270 (Ky. 2012) (quoting *Schambon v.*

---

[4] Higgins alleges that the trial court's decision to join the indictments violated RCr 9.16, Kentucky Rule of Evidence (KRE) 404, and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

[5] RCr 8.31 was previously RCr 9.16. Effective January 1, 2015, RCr 9.16 was deleted and the text of the rule was shifted to RCr 8.31. As Higgins was charged and tried when the previous version of RCr 9.16 was still in effect, we will apply it to the present case.

6

*Commonwealth*, 821 S.W.2d 804, 809 (Ky. 1991)). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Daugherty v. Commonwealth*, 467 S.W.3d 222, 231 (Ky. 2015) (quoting *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

As we have previously articulated, there are several advantages to conducting a joint trial which addresses multiple charges. *Peacher v. Commonwealth*, 391 S.W.3d 821, 836 (Ky. 2013). Trials are costly and burdensome to each of the actors involved in the proceedings. *Id.* Joint trials further aid in assuring that defendants are tried in a timely manner, while at the same time reducing the risk of inconsistent verdicts. *Id.* Due to these and other advantages afforded by the joinder of charges, RCr 6.18 provides for the liberal joinder of offenses.

However, separate offenses are not permitted to be joined indiscriminately. In order to justify a single trial there must be a sufficient nexus among the joined offenses. *Id.* This Court has long held that joinder is proper where "the crimes are closely related in character, circumstances, and time." *Seay v. Commonwealth*, 609 S.W.2d 128, 131 (Ky. 1980). "Offenses that stem from closely related events and which occur within a short period of time may be properly joined in one indictment." *Chestnut v. Commonwealth*, 250 S.W.3d 288, 299 (Ky. 2008).

Higgins's offenses all occurred within a close time period. Higgins's first offenses - burglary and rape - occurred between 10:20 p.m. and 11:00 p.m.

7

Subsequently, Higgins broke into and stole property from, the cars belonging to the Watsons. After completing the theft, Higgins forced entry into the Blanton residence, stole property, and fell asleep while in the residence. Higgins was discovered the following morning by the Blanton family, who promptly called the authorities at 10:18 a.m. As a result, all of Higgins's offenses occurred during a twelve-hour period.

In addition to the offenses being closely related in time, they also were in close geographic proximity to one another. The Nancy and Blanton residences were both located on Star Avenue. According to the testimony of Detective Allen, the total distance from one end of Star Avenue to the other was two hundred and fifty feet. He also testified that the distance between the Nancy and Blanton residences was between seventy-five and one hundred and twenty-five feet. Those residences are also located near 830 East Main Street where the auto thefts occurred.[6]

Additionally, the indictments concerned crimes of a similar character. In both indictments, Higgins committed crimes against property, by burglarizing the residences of Nancy and Blanton and by stealing property belonging to the Watsons. These property crimes were each part of an ongoing course of conduct that began with Higgins burglarizing Nancy's residence and only ended with his arrest approximately twelve hours later. The facts here demonstrate that a clear nexus and logical relationship exists between these close-in-time

---

[6] During his testimony, Detective Allen described that by cutting across a small field Star Avenue and Main Street are easily accessible to each other.

8

events. We therefore conclude that the separate offenses were properly joined under RCr 6.18.

Having concluded that joinder was proper, the inquiry turns to whether Higgins was unnecessarily prejudiced by the joinder of the indictments. Higgins claims that the joinder of the indictments hampered his ability to produce evidence of an intoxication defense that would have been relevant to his burglaries, but not his rape charge. Higgins fails to specify how his ability to put forward an intoxication defense was hampered by the joinder of the indictments.

Additionally, despite the joinder of the charges, evidence was introduced and argument was made during the trial that could have potentially supported a voluntary intoxication defense. An edited recording of Higgins's conversation with police was played for the jury, during which Higgins admitted to drinking and becoming drunk at his uncle's residence. Further, Higgins's counsel was able to establish during the cross examination of Officer Morris that Higgins had the odor of alcohol about him when he was apprehended.

However, that evidence was contradicted by the testimony of Higgins's uncle, Darnell Simpson. Simpson testified that he had a small party at his home the night of the rape, and that while there was drinking at the party, Simpson did not recall Higgins drinking. Further, Simpson concluded that he did not believe that Higgins was under the influence of any other substance. The trial court ultimately declined to include a jury instruction for voluntary intoxication concerning the burglary of the Blanton residence.

The simple fact that a defendant claims to have different defenses to similar or identical charges does not inherently preclude joinder of those charges in a single trial. Further, that the joinder of charges will hamper a defendant from presenting a certain defense is not enough to mandate severance. *See Owens v. Commonwealth*, 572 S.W.2d 415, 416 (Ky. 1977). Higgins is unable to demonstrate how his voluntary intoxication defense was hampered by the joinder of the charges in his case. Additionally, Higgins was able to present an intoxication defense, it simply was unsuccessful, due in large measure to the testimony of his own witness. Under these circumstances, Higgins has not demonstrated undue prejudice flowing from the joinder of his charges.

Higgins also argues that the rape and burglary charges in indictment number 13-CR-0071 were so heinous that they unjustly impacted the jurors' thoughts and views on the charges included within indictment number 13-CR-0064. Higgins alleges that prejudice is shown by the jury's decision to recommend the maximum sentence in his case. Due to his status as a persistent felony offender in the first degree, Higgins was eligible to receive a life sentence if convicted of rape or either of the burglary charges.

At trial, the Commonwealth presented overwhelming evidence of Higgins's guilt. Between the DNA evidence regarding the Nancy crimes and Higgins being caught in the Blanton residence, there was no question as to his culpability. Given his criminal history and the nature of his crimes, the decision of the jury to recommend a life sentence was not unreasonable. It is

unsupported speculation to conclude that the penalty decision of the jury was due to the presence of one charge. As such, Higgins has not shown sufficient undue prejudice to convince us that the trial court abused its discretion in refusing to sever the charges.

## II. The Trial Court Correctly Denied Higgins's Motion For a Mistrial

Higgins also alleges that the trial court committed reversible error when it failed to declare a mistrial when a juror admitted that she had spoken to a family member of Nancy. After the jury had been sworn and counsel had made their opening statements, the trial court recessed the trial for lunch. During the lunch break, juror Melissa Adams was sitting outside on a bench when she recognized a young man with whom she used to work. Adams approached and hugged the young man and they spoke briefly.

Adams immediately alerted the trial court to this interaction. Outside the presence of the jury, the trial court conducted an inquiry. The trial court learned that the pair did not discuss the case and that Adams did not know if the man she spoke to was related to the victim in the case. After excusing Adams, the trial court, learned that the young man who spoke to Adams was the grandson of the victim. Subsequently, Higgins requested a mistrial due to Adams's contact with Nancy's grandson. The trial court denied the request.[7]

---

[7] Higgins alleges that the trial court's denial of his motion for a mistrial denied him the right to an impartial jury, in violation of Section 11 of the Kentucky Constitution and the Sixth and Fourteenth Amendments to the United States Constitution.

"[T]he trial judge is in the best position to determine the nature of alleged juror misconduct and the appropriate remedies for any demonstrated misconduct." *Ratliff v. Commonwealth,* 194 S.W.3d 258, 276 (Ky. 2006) (quoting *United States v. Sherrill,* 388 F.3d 535, 537 (6th Cir. 2004)). A trial judge's factual findings are reviewed only for clear error. *Miller v. Eldridge,* 146 S.W.3d 909, 915 (Ky. 2004). In the case at hand, the trial court determined that Adams's interaction with the rape victim's grandson was only casual contact. Further, he found no evidence that Adams was being anything less than forthright about the interaction.

"A mistrial is not warranted if the conversation between the witness and the juror was 'innocent' and matters of substance were not involved." *Talbott v. Commonwealth,* 968 S.W.2d 76, 86 (Ky. 1998) (citing *Jones v. Commonwealth,* 662 S.W.2d 483-84 (Ky. App. 1983)). "The true test is whether the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." *Talbott,* 968 S.W.2d at 86 (citation omitted).

Here, the contact between Adams and a relative of the victim was clearly innocent, a chance encounter that amounted to only a few moments of casual greetings. At no time during their conversation were matters of substance discussed. Additionally, Adams was unaware that the man she was speaking to was related to the victim. Under these circumstances, we conclude that the trial judge properly concluded that a mistrial was not warranted. *See Woodward v. Commonwealth,* 147 S.W.3d 63, 68 (Ky. 2004) ("[A] mistrial is an extreme remedy and should be resorted to only when there is a fundamental

12

defect in the proceedings and there is a 'manifest necessity for such an action.'" (quoting *Bray v. Commonwealth*, 68 S.W.3d 375, 383 (Ky. 2002))).

## III. The Trial Court Made Clerical Errors in its Sentencing Order

Higgins alleges two errors by the trial court in its sentencing order. The first alleged error was that the trial court sentenced Higgins to three consecutive life sentences. The second alleged error was the decision of the trial court to have Higgins's life sentence run consecutively to a five-year term of imprisonment that he had received in another case.[8] As the two issues are intertwined and involve similar analysis they will be addressed together.

Higgins first claims that the trial court committed reversible error in sentencing Higgins to three consecutive life sentences. The jury's penalty verdict recommended life sentences for rape and each of two counts of burglary and ten year sentences for each count of theft by unlawful taking, value $500.00 or more. Additionally, the jury recommended that each offense run consecutively to each other for a total sentence of three consecutive life sentences and twenty years. The trial court's "final judgment on trial verdict after reviewing pre-sentence investigation sentence of imprisonment," notes the recommendation of the jury, but is silent as to whether Higgins's sentence was in accord with the jury's recommendation.

During Higgins's sentencing hearing, the trial court was clear that the sentences for the charges in indictment numbers 13-CR-0071 and

---

[8] Higgins alleges that the trial court's sentencing order violated his due process rights under the Fifth and Fourteenth Amendments to the United States Constitution.

13

13-CR-0064 were to run concurrently with each other. Additionally, there was a discussion between the trial court, the Commonwealth's Attorney, and Higgins's counsel where it was universally agreed that the sentences as a matter of law were required to be concurrent. Their conclusion was accurate as it is well established that life sentences may not be ordered to run consecutively. *Bedell v. Commonwealth*, 870 S.W.2d 779, 783 (Ky. 1993). Additionally, when imposed as a result of the same trial, a sentence for a number of years cannot run consecutively with a life sentence. *See v. Commonwealth*, 746 S.W.2d 401, 403-04 (Ky. 1988). Finally, if the court does not specify the manner in which a sentence imposed by it is to run, as here, that sentence "shall run concurrently" with other sentences subject to exceptions not applicable here. KRS 532.110(2)).

Where there is a conflict between a court's written judgment and its oral statements, the written judgment controls. *Commonwealth v. Taber*, 941 S.W.2d 463 (Ky. 1997), *overruled on other grounds by Keeling v. Commonwealth*, 381 S.W.3d 248 (Ky. 2012). This general rule does have several exceptions, including RCr 10.10, which permits a trial court to correct clerical errors.

Clerical errors are "all errors, mistakes, or omissions which are not the result of the exercise of the judicial function." *Machaniak v. Commonwealth*, 351 S.W.3d 648, 652 (Ky. 2011) (quoting *Buchanan v. West Ky. Coal Co.*, 218 Ky. 259, 291 S.W. 32, 35 (Ky. 1927)). The distinction between clerical and judicial errors "does not depend so much upon the person making the error as

14

upon whether it was the deliberate result of judicial reasoning and determination, regardless of whether it was made by the clerk, by counsel, or by the judge." *Id.* (citation omitted).

We have previously held that "[t]he failure to accurately reduce to writing the trial court's intended sentence, a sentence which was evident from a review of the videotaped record and made known to both parties at the sentencing hearing, was a clerical error[.]" *Id.* at 654. Such was the situation in the case at hand. Due to a clerical error, the sentence announced during the sentencing hearing was not properly reflected in the trial court's written order.[9]

As clerical errors are not the result of judicial reasoning, additional substantive proceedings are unnecessary to correct the trial court's sentencing order. We choose, instead, to order the trial court to implement the intent expressed during the sentencing hearing, which would have been given effect in the judgment absent clerical error. Accordingly, we remand for entry of judgment consistent with the intent expressed by the trial court during the sentencing hearing, namely that the sentences under indictments 13-CR-0065 and 13-CR-0071 are to run concurrently with each other.

---

[9] Higgins argues that the trial court's clerical error was in fact a judicial error. In support of this position he cites *Dublin v. Osborne*, 388 S.W.2d 588 (Ky. 1965). In *Dublin*, our predecessor Court, granted a writ of mandamus to vacate an order committing Dublin to the penitentiary. *Id.* at 591. The trial court modified its sentencing order, to run his convictions consecutively rather than concurrently, while Dublin's case was on appeal. *Id.* at 589. The Court's decision to grant the writ was based on the strong suspicion that the trial court may have arbitrarily increased Dublin's sentence. *Id.* at 590. The specter of vindictiveness present in *Dublin* is not present in this case. Rather, the trial court simply erred by failing to include in his written order, the terms pronounced at the sentencing hearing.

15

However, with regard to the trial court's oral order that Higgins's life sentence run consecutively to his pre-existing five-year sentence, additional analysis is required. Higgins correctly points out that there are no published opinions from this Court that state whether a life sentence could be run consecutively to a five-year sentence he was already serving in another case. However, there are previous cases that are helpful in determining whether such a sentence would be permissible.

In *Stewart v. Commonwealth*, 153 S.W.3d 789 (Ky. 2005), Stewart was convicted of first-degree rape and first-degree burglary, receiving a sentence of ten years. While on parole for that sentence, Stewart committed first-degree robbery and received a life sentence. *Id.* at 790-791. At issue in the case was the scope and application of the powers of the Parole Board in making a decision to deny parole to a prison inmate. *Id.* at 790. In dicta, the Court noted that it was improper to order a term-of-years sentence to run consecutively with a life sentence when the defendant had been convicted of those offenses in the same trial. *Id.* at 792. However, the Court distinguished Stewart's situation as he was sentenced to a term of years and imprisoned prior to receiving his life sentence. *Id.* Stewart's life sentence would only begin upon service of his term of years. *Id.* While the Court decided Stewart's case on other grounds, the Court did appear to condone a subsequent life sentence being run consecutively to an existing term of years.

A similar issue was addressed in *Clay v. Commonwealth,* 2010 WL 2471862 (Ky. 2010).[10] Clay was convicted of rape and sodomy and sentenced to thirty years' imprisonment. At the time of his sentencing hearing, Clay had been convicted for rape and murder in an unrelated case and sentenced to life imprisonment. *Id.* The trial court elected to run Clay's thirty-year sentence consecutively to his previously imposed life sentence. *Id.* Although Clay argued that this sentencing construction was error, we disagreed.

When read together KRS 532.080 and 532.110 apply to sentences issued in the same action for separate offenses. *Id.* at 4. As a result, it is improper to run a life sentence consecutively to a sentence for a term of years, when both sentences arise out of the same action. *Id.* However, Clay had a life sentence which predated his term-of-years sentence. *Id.* As those sentences arose out of different cases, the sentences were permitted to run consecutively to each other. *Id.*

Higgins argues against the application of *Clay* based on the timing of his offenses. Both his instant case and those charges listed under indictment number 13-CR-0047 were pending contemporaneously. Additionally, the criminal acts which were the basis of this case preceded the return of an indictment in 13-CR-0047.[11] However, those two factors do not impact

---

[10] As CR 76.28(4)(c) permits citation of unpublished Kentucky appellate decisions, rendered after January 1, 2003, "if there is no published opinion that would adequately address the issue before the court."

[11] The date that the offenses charged under indictment number 13-CR-0047 occurred is not present in the record. However, Higgins's assertions as to the timing of the offenses are not contradicted by the Commonwealth's brief.

17

whether the trial court was able to order the sentences in those cases to be served consecutively. As *Clay* permitted a trial court to run a new sentence of a term of years consecutive to an existing life sentence, that same logic permits the trial court to run an existing term-of-years sentence consecutive to a new sentence of life imprisonment.[12]

The trial court's omission in its sentencing judgment that Higgins's life sentence was to run consecutively with his previous five-year sentence was a clerical error made in reducing the oral judgment to writing. As clerical errors do not require substantive proceedings to be corrected, we remand for entry of a corrected judgment consistent with the intent expressed by the trial court during the sentencing hearing as to this issue as well.

## IV. The Commonwealth's Statements During Closing Argument Did Not Amount to Palpable Error.

In his argument concerning the impropriety of his sentence, Higgins also alleged prosecutorial misconduct for a statement made during closing

---

[12] Higgins also argues that as the trial court did not specify in its written order that Higgins's life sentence be consecutive to his five year sentence, that under KRS 532.110(2) those sentences must be run concurrently. In support of this proposition, Higgins cites the Court to *Caldwell v. Commonwealth*, 12 S.W.3d 672 (Ky. 2000). However, the Court's decision in *Caldwell* is contrary to Higgins proposition. Caldwell was serving a five year sentence when he subsequently received a ten year sentence. *Id.* at 673. At sentencing, the trial court orally ordered for those sentences to be served consecutively for a total sentence of fifteen years. *Id.* Despite the trial court's statements at sentencing, the sentencing order was silent as to whether the charges would run concurrently or consecutively. *Id.* Approximately eight months later, the trial court entered an amended judgment and sentence which added language ordering that the sentences be served consecutively. *Id.* at 674. On review, the Court determined that "the omission in the original judgment of a provision that Caldwell's sentence was to run consecutive with his previous sentence was a mistake made in reducing the oral judgment to writing." *Id.* The Court permitted the sentences to run consecutively as the failure to include that language in the original sentencing order was deemed to be clerical error. *Id.* at 675.

18

argument of the penalty phase. Specifically, the Commonwealth requested that the jury sentence Higgins to three consecutive life sentences. There was no objection to this statement at trial. Ultimately, the jury followed the argument of the Commonwealth and recommended a sentence of three consecutive life sentences and twenty years.

As this issue is unpreserved we review it to determine whether it constitutes palpable error under RCr 10.26. It is clear that the Commonwealth's argument to the jury that they run the life sentences consecutively was error. As explained in the preceding section, life sentences may not be ordered to run consecutively. *Bedell*, 870 S.W.2d at 783. The Commonwealth is not permitted to ask the jury to return a sentence that it knows to be improper.

However, the Commonwealth's statement did not rise to the level of palpable error. An appellate court may reverse for prosecutorial misconduct occurring during closing argument only if the misconduct is "flagrant." *Matheney v. Commonwealth*, 191 S.W.3d 599 (Ky. 2006) (citing *Barnes v. Commonwealth*, 91 S.W.3d 564 (Ky. 2002)). Alternatively, reversal is proper if each of the following conditions is satisfied: (1) the proof of guilt is not overwhelming; (2) an objection is made, and (3) the trial court failed cure the error with a sufficient admonishment to the jury. *Id.* (citation omitted).

As the proof in the case was overwhelming and there was no objection to the Commonwealth's statement, reversal is only proper if the misconduct is deemed to be flagrant. We use a four-part test to determine whether a

19

prosecutor's improper comments amount to flagrant misconduct. The four factors to be considered are: "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused." *Hannah v. Commonwealth*, 306 S.W.3d 509, 518 (Ky. 2010) (citing *United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994), *superseded by statute* KRS 503.055 and 503.050).

As to the first factor it is hard to see how Higgins was prejudiced by the Commonwealth's statement. While the jury recommended three consecutive life sentences, it was clear that the trial court would not follow that recommendation, and instead impose concurrent life sentences. The heinous nature of Higgins's crimes made it likely that even absent the remarks of the Commonwealth the jury would have imposed a harsh penalty. This factor weighs in the Commonwealth's behalf.

As to the second factor, the statement of the Commonwealth was isolated. Occurring in closing argument during the penalty phase, it amounted to a brief moment in a two-day trial. This factor weighs in the Commonwealth's behalf. As to the third factor, we can only conclude that the comments were deliberately placed before the jury. This factor weighs in Higgins's behalf. The fourth factor is the weight of the evidence against Higgins. The Commonwealth put forward overwhelming evidence of Higgins's guilt. Due to DNA evidence and Higgins's being caught in the Blanton residence, there

20

was no question as to his guilt. This factor weighs in the Commonwealth's behalf.

After a review of the four factors, we conclude that the Commonwealth's statement was not so egregious as to have undermined the essential fairness of Higgins's trial. While we strongly disapprove of the Commonwealth requesting the jury recommend an improper sentence, we do not believe that statement merits either reversal of Higgins's convictions or a new penalty phase. While the statement of the Commonwealth was improper, it did not constitute flagrant misconduct.

## CONCLUSION

For the foregoing reasons, we affirm the conviction and sentence, and this case is remanded to the circuit court for entry of a corrected judgment consistent with the trial court's stated intent at the time of sentencing.

All sitting. All concur.


COUNSEL FOR APPELLANT:

Jason Apollo Hart
Assistant Public Advocate
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Andy Beshear, Attorney General of Kentucky

David Bryan Abner
Assistant Attorney General
Office of the Attorney General