# IMPORTANT NOTICE

## "NOT TO BE PUBLISHED OPINION"

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED" PURSUANT TO RULE OF APPELLATE PROCEDURE (RAP) 40(D). THIS OPINION SHALL NOT BE CITED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE.

UNDER RAP 41, UNPUBLISHED OPINIONS OF KENTUCKY APPELLATE COURTS RENDERED AFTER JANUARY 1, 2003, THAT ARE FINAL UNDER RAP 40(G), MAY BE CITED BY A PARTY FOR CONSIDERATION BY A COURT IF THERE IS NO PUBLISHED OPINION THAT ADEQUATELY ADDRESSES THE POINT OF LAW BEING ARGUED BY A PARTY.

IF AN UNPUBLISHED OPINION IS CITED FOR CONSIDERATION BY A COURT THE OPINION SHALL BE SET OUT AS AN UNPUBLISHED OPINION IN THE DOCUMENT IN WHICH THE UNPUBLISHED OPINION IS CITED.

RENDERED: APRIL 23, 2026
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2024-SC-0521-MR

JAMES LEWIS WATTS                                          APPELLANT

V.                  ON APPEAL FROM GRAVES CIRCUIT COURT
HONORABLE TYLER L. GILL, JUDGE
NO. 21-CR-00300

COMMONWEALTH OF KENTUCKY                      APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

James Lewis Watts was convicted of four counts of first-degree sexual abuse, two counts of first-degree sodomy, two counts of first-degree incest, and one count of indecent exposure, for which he was sentenced to life in prison. Watts now appeals his conviction as a matter of right,[1] asserting three points of error: (1) his trial was improperly joined with that of his brother, who was also charged with various offenses relating to the same victims; (2) he was denied the ability to present a full defense when he was prohibited from raising his ex-wife's and the children's prior sexual abuse allegations against other individuals; and (3) his right to confront the witnesses against him was undermined by placing the testifying victims out of view of Watts. For reasons

---

[1] KY. CONST. § 110(2)(b).

largely identical to those expressed in his brother's appeal, *Watts v. Commonwealth*, No. 2024-SC-0487-MR, 2025 WL 3768604 (Ky. Dec. 18, 2025), we affirm in full the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

Watts married R.S.[2] in 2015. The pair moved to Mayfield, Kentucky, where they lived until 2018. Along with the couple, six other individuals lived in the home: R.S.'s minor son, G.T.; her daughters, A.D. and M.D.;[3] Watts's brother, James Edward Watts (hereinafter "Bubba");[4] and R.S.'s mother, Maggie, and her mother's boyfriend, Chris. Watts and R.S. shared a room; Bubba shared a room with G.T.; A.D. and M.D. shared a room; and Maggie and Chris slept in the living room.

During their residence in Mayfield, all adults in the home worked regular jobs—sometimes multiple jobs—except for Bubba, who often babysat the children alone. On other occasions, the Watts brothers babysat the children together. On the surface, this was a good living arrangement, and everyone appeared to get along well.

In March 2017, A.D. spoke to a social worker at her school about incidents that occurred between her and Bubba. The allegations were

---

[2] We use initials for the victims' mother to further protect the identities of the minor victims.

[3] We use the initials of the children, who are the minor victims in this case, to protect their identities.

[4] James Edward was referred to by his nickname Bubba throughout the proceedings against the brothers. For the sake of clarity, we will continue to refer to James Edward as Bubba.

2

investigated by law enforcement and the Cabinet for Health and Family Services. Consequently, R.S., along with her children, moved out of the home. Ultimately, the Cabinet found the allegations to be unsubstantiated, and R.S. and the children returned.

R.S. and the children did not remain in the home for long. Shortly after her return, R.S. discovered Watts had been unfaithful, and the couple separated in the fall of 2017. R.S. moved out, and the children were sent to live with other caretakers; G.T. went to live with his biological father, and A.D. and M.D. went to Georgia to live with an aunt. Watts and R.S. divorced in February 2018.

In 2020, G.T. disclosed that he had been sexually abused while living in the Mayfield home. That disclosure led to another during a forensic interview, which, in turn, led to the forensic interviews of A.D. and M.D. These forensic interviews uncovered multiple instances of sexual abuse, which led to the arrest of Watts and Bubba. In August of 2021, Watts was indicted on three counts of first-degree sexual abuse, three counts of first-degree sodomy, three counts of first-degree incest, and one count of indecent exposure. The grand jury later returned a superseding indictment against him, adding another count of sexual abuse for masturbating on M.D. Bubba was indicted on similar charges.

Prior to trial, Bubba filed a motion for a separate trial from Watts, which Watts joined. The Commonwealth, conversely, sought to have both defendants

3

joined for trial. The circuit court determined joinder to be proper, and Watts and Bubba proceeded to trial together.

At trial, all three children testified. We will not rehash the abuse here, details of which can be found in Bubba's appeal.[5] To put it simply, the three child victims detailed multiple instances of abuse committed by both Watts and Bubba, including anal penetration of G.T. and instances of inappropriate touching of A.D. and M.D. The testimony indicated that each brother committed the abuse separately from the other. Other details of the trial will be adduced as needed below. At the close of trial, the jury found Watts guilty of four counts of first-degree sexual abuse, two counts of first-degree sodomy, two counts of first-degree incest, and one count of indecent exposure. Watts was acquitted of one charge of sodomy and one charge of incest, both related to his alleged act of having anal sex with G.T. The jury recommended a sentence of life in prison for Watts, which the circuit court adopted.

## Analysis

Watts appeals his conviction, asserting three points of error justifying reversal. First, he contends that the circuit court erred in joining his trial with that of Bubba because Watts's crimes and Bubba's are distinct from one another, even if they involved the same victims in the same setting. Second, he argues that his inability to robustly examine R.S. and the children as to past allegations of sexual abuse made against other individuals paralyzed his

---

[5] *Watts*, 2025 WL 3768604.

defense, since the testimony of the victims was foundational to the charges against him. Finally, Watts asserts the circuit court violated his right to confront the witnesses against him by denying him face-to-face contact with his accusers. In the event no single alleged error justifies reversal, Watts further argues the cumulative effect of the errors entitles him to a new trial. Each of the three issues raised by Watts was also raised in Bubba's appeal. To the extent the claims made by Watts differ from Bubba's in some substantive way, we will address those differences below; otherwise, our previous opinion controls the outcome here as well.

## I.  Joinder was proper.

Watts's first argument is that he was improperly joined with Bubba for trial. He argues that, because each brother committed his crimes independently of the other, one of the guideposts for joinder—the cross-admissibility of evidence—is absent, even if the victims and the setting of the crimes are the same. This issue was properly preserved. Because, as we stated in Bubba's appeal, the brothers met the standard for joinder under RCr 6.20, and because joinder was not otherwise unduly prejudicial to Watts, we hold the circuit court did not err in joining the brothers for trial.

The question of whether the standard for joinder was met for Watts presents the same analysis as for Bubba, and so we adopt the language we used in that opinion:

> "We review the trial court's denial of a motion to sever for abuse of discretion, ... and the burden is on the appellant to show that the denial was in fact unfairly prejudicial." *Peacher v. Commonwealth*, 391 S.W.3d 821, 834 (Ky. 2013) (citing *Quisenberry v.*

5

*Commonwealth*, 336 S.W.3d 19, 26 (Ky. 2011)). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky. 1999).

"We have a long-recognized preference in our criminal law for jointly trying defendants who are, or could have been, jointly indicted. Joint trials promote judicial economy and consistent verdicts; but they present unique difficulties, as well." *Darcy v. Commonwealth*, 441 S.W.3d 77, 79 (Ky. 2014). Kentucky Rule of Criminal Procedure ("RCr") 9.12 states:

> The court may order two (2) or more indictments, informations, complaints or uniform citations to be tried together if the offenses, and the defendants, if more than one (1), could have been joined in a single indictment, information, complaint or uniform citation. The procedure shall be the same as if the prosecution were under a single indictment, information, complaint or uniform citation.

RCr 6.20 states:

> Two (2) or more defendants may be charged in the same indictment, information or complaint if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately, and all of the defendants need not be charged in each count.

(emphasis added).

[Bubba] argues that joinder was improper because he and [Watts] "did not participate in the same acts or transactions constituting an offense or offenses" as required under RCr 6.20. [Bubba] argues none of the alleged incidents involved both defendants, and they were not charged with complicity. The defendants were not indicted together, and [Bubba's] indictment does not mention [Watts]. No evidence was presented that either brother knew what the other was doing or that either brother assisted the other in providing opportunity to commit the crimes, facilitating the crimes, or concealing the crimes.

However, while [Bubba] and [Watts] did not jointly commit the same act, they both were involved in the same series of acts. The nature of the sex acts [Bubba] and [Watts] were alleged to have induced were similar — both were accused of forcing both A.D. and G.T. to perform oral sex on them, forcing G.T. to receive anal sex, rubbing A.D.'s genitals, and threatening to punish A.D. if she disclosed the abuse. We have said:

> The advantages of joint trials, whether of multiple charges or multiple defendants, are obvious. Trials are costly and burdensome to courts, parties, witnesses, and victims, so the savings from resolving a matter in a single trial rather than two or more separate trials are significant. This seems especially so when the evidence for separate counts will overlap to a considerable extent. It seems wasteful to require the Commonwealth to put on the same proof multiple times, to require witnesses to attend and give the same testimony at different trials, and to require separate juries to consider substantially identical evidence. Joinder also helps assure that defendants are tried for their alleged offenses in a timely manner. A joint trial, moreover, by allowing a single jury to pass on all the charges and to hear all the evidence, minimizes the risk of inconsistent verdicts. Given these many advantages, RCr 6.18 provides for the liberal joinder of offenses.

*Peacher*, 391 S.W.3d at 836–37. We have also acknowledged that, even considering the advantages of the joinder of trial, joinder is nevertheless limited to cases in which there is a sufficient nexus between the acts. *Id.* at 837.

> The required nexus does not arise simply from the proximity of the alleged crimes in time and space, although proximity is certainly relevant, but rather from a "logical" relationship between them, some indication that they arose one from the other or otherwise in the course of a single act or transaction, or that they both arose as parts of a common scheme or plan.

*Id.* The Commonwealth's theory of the case involved both defendants working together to find opportunities for each other to abuse the minor children. The abuse of the children happened over the same period of time and involved overlapping children, the

7

same familial structure, and the same living arrangements. The uniformity of acts and evidence present in this case creates the sort of series of acts, happening during the same course of time in the same residence, that are so closely connected as to maximize the utility of a joint trial. "[C]onsiderations of judicial economy and the efficiency of avoiding multiple trials are reasons for joint trials." *Garrett v. Commonwealth*, 534 S.W.3d 217, 223 (Ky. 2017). One particular benefit in minimizing the number of trials which relate to the same acts or series of acts is that the victims are only put through the rigors of testifying at trial and reliving the alleged abuse once. The trial court acknowledged this when it said, "we've got alleged victims here. We can put them through it once or twice. And all of the things being equal, let's make it once."

*Watts*, 2025 WL 3768604 at *3-4.

As we acknowledged in Bubba's appeal, judicial efficiency is not dispositive of the issue, rather RCr 8.31 provides,

If it appears that a defendant or the Commonwealth is or will be prejudiced by a joinder of offenses or of defendants in an indictment, information, complaint or uniform citation or by joinder for trial, the court shall order separate trials of counts, grant separate trials of defendants or provide whatever other relief justice requires. A motion for such relief must be made before the jury is sworn or, if there is no jury, before any evidence is received. No reference to the motion shall be made during the trial. In ruling on a motion by a defendant for severance the court may order the attorney for the Commonwealth to deliver to the court for inspection in camera any statements or confessions made by the defendants that the Commonwealth intends to introduce in evidence at the trial.

Watts directs us to only one ground for undue prejudice: the admission of evidence against Bubba that would not have been admissible against Watts. Again, this is an issue that was raised and resolved in Bubba's appeal:

[T]hat evidence was presented concerning a victim only pertinent to [Watts] and not to [Bubba] was not unduly prejudicial to [Bubba].

[I]n assessing whether joinder resulted in undue prejudice, we have asked, with KRE 404(b) particularly in mind, "whether evidence necessary to prove each

8

offense would have been admissible in a separate trial of the other." *Roark v. Commonwealth*, 90 S.W.3d 24, 28 (Ky. 2002) (citing *Price v. Commonwealth*, 31 S.W.3d 885 (Ky. 2000) and *Rearick v. Commonwealth*, 858 S.W.2d 185 (Ky. 1993)). If so, then the evidentiary objections to joinder, at least, have been deemed answered. *Id. See also Keeling v. Commonwealth*, 381 S.W.3d 248, 270–72 (Ky. 2012) (murder and attempted murder charges properly joined because the two incidents would have been mutually admissible in separate trials).

If not, if evidence of the separate offenses would not have been mutually admissible at separate trials, then we have asked further whether the jury's belief as to either offense was "substantial[ly] like[ly] ... [to have been] tainted" by inadmissible evidence of the other. *Rearick v. Commonwealth*, 858 S.W.2d at 188. Only if the defendant can show that he was thus actually prejudiced by an erroneous refusal to sever is he entitled to appellate relief.

*Peacher*, 391 S.W.3d at 838–39. [Bubba] fails to meet that burden to show that he was actually prejudiced by the joint trial. Simply having the jury consider evidence not applicable to a defendant does not automatically [impute] prejudice onto that defendant, lest the language of RCr 6.20, which states "all of the defendants need not be charged in each count," be rendered superfluous. Again, that the jury was able to track the separate counts and those who committed them is evidenced by [Bubba]'s acquittal of the charges related to G.T. and [Watts's] acquittal of some, but not all, of the charges related to G.T.

*Watts*, 2025 WL 3768604 at *6.

That reasoning applies with equal force to Watts. We additionally observe that the verdict of the jury further convinces us that Watts was not unduly prejudiced by the joinder. He was not convicted of all the charges against him, as the jury acquitted him of the sodomy and incest counts regarding G.T. This suggests the jurors were able to compartmentalize in their

9

minds each incident and apply the facts to the respective defendant. Had they not been able to do so, we might expect the cumulative effect of G.T.'s accusations against both brothers to push the jury toward a guilty verdict. That did not happen for either Watts or Bubba. Accordingly, we hold Watts was not unduly prejudiced by the joinder of his trial with Bubba's and no error arose from such.

II.    Questions regarding prior abuse accusations were properly limited.

Watts next claims the circuit court erred when it determined KRE 412, Kentucky's "Rape Shield Law," barred extensive testimony about R.S.'s prior allegations of sexual abuse against her prior romantic partner and the victims' prior allegations of sexual abuse against their mother's partners and biological parents. Watts contends the limits set by the court ran afoul of his right to present a defense and confront his accusers, noting, "[t]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). This issue is preserved.

Although Watts makes an unexplained statement that "[t]he disparate treatment of James Lewis and James Edward may stem from the fact the previous allegations were untrue or R.S. may have been more willing to encourage these allegations because based on her previous experience," we can discern no substantive difference between the claim made by Watts here and the claim made by Bubba in the other appeal. Accordingly, we adopt the reasoning of that opinion, partially reproduced below.

10

In a proceeding involving alleged sexual misconduct, KRE 412 precludes the introduction of "(1) Evidence offered to prove that any alleged victim engaged in other sexual behavior [or] (2) Evidence offered to prove any alleged victim's sexual predisposition." KRE 412(a)(1) & (2). Our discussion of the evidence Bubba sought to introduce—the same evidence as Watts—is applicable to both brothers:

> The evidence [Bubba] sought to introduce was the opposite of evidence of the victims' sexual history. [Bubba] sought to introduce the absence of sexual behavior by alleging that allegations made against men in [R.S.]'s life were false. We have excepted prior accusations from KRE 412 protections only when they are demonstrably false, and then, only if probative under KRE 608(b), and further, they pass the balancing test under KRE 403. *Dennis v. Commonwealth*, 306 S.W.3d 466, 469 (Ky. 2010). Therefore, whether the evidence [Bubba] sought to introduce is barred by KRE 412 depends first on whether the evidence was demonstrably false. "To meet that standard, the proponent must show that there is a distinct and substantial probability that the prior accusation was false." *Dennis*, 306 S.W.3d at 475. This standard of proof is less than absolute proof of falsity. *Perry v. Commonwealth*, 390 S.W.3d 122, 130 (Ky. 2012).
>
> . . . .
>
> [Bubba] argues that the allegations were demonstrably false because the reports were unsubstantiated and because both fathers of [R.S.]'s children testified that the allegations were untrue. This is insufficient to prove that the allegations were demonstrably false. We have specifically said that "a mere denial by the alleged perpetrator of the prior accusation or an inconclusive investigation would not be enough to demonstrate a distinct and substantial probability of falsity." *Id.* And, while the father of A.D. and M.D. testified that the allegations against him concerning A.D. were false, [R.S.] implicitly testified that the allegations were true when she explained that A.D. told her that her genitals hurt because her father touched her and demonstrated how he had done so. As for [Bubba's] contention that the unsubstantiated findings somehow make the allegations demonstrably false, we have said that "investigations that do not

11

exonerate but merely fail to substantiate are not sufficiently probative of falsity to justify breaching the alleged victim's shield." *Dennis*, 306 S.W.3d at 475. Unsubstantiated allegations only mean that there was not enough evidence of the allegations to support a finding that the allegation happened, not that the allegation, in fact, did not happen. Because [Bubba] failed to prove that the allegations were demonstrably false, the past allegations of sexual abuse against men in [R.S.]'s life are protected by KRE 412.

*Watts*, 2025 WL 3768604 at *8-9. Because the evidence touches upon the victim's alleged history of sexual conduct (even if offered to undermine that history) and that evidence is not demonstrably false, it is excluded by KRE 412. The circuit court did not err in so ruling.

III.    The victims were properly screened from Watts at trial.

Watts argues that the positioning of the witnesses violated his right to confront his accusers. Prior to trial, the circuit court confronted the issue of how to arrange witnesses so that the jury would be able to see them. The court's solution was to

arrange[] for a table to sit in the middle of the court room for witnesses to sit facing the jury. The trial court explained that it did this so the witnesses can sit in full view of the jury, apparently because the original courtroom layout meant that the witnesses would have been at least partially blocked had they sat in the witness box. The trial court also explained that children tend to hide behind walls if they are available, but putting the child witness at the table would make the child more at ease.

*Watts*, 2025 WL 3768604 at *14. Watts believes this arrangement violates his confrontation rights as he was unable to see the witness's faces as they spoke. Further, he argues that required findings of KRS[6] 421.350, which broadly

---

[6] Kentucky Revised Statutes.

12

allows the testimony of child victims of illegal sexual activity to be taken outside the courtroom, were not made. This issue is preserved. Watts's main argument regarding the Confrontation Clause was addressed in the companion appeal, which we adopt here. However, Bubba did not raise the applicability of KRS 421.350 in his appeal, so we address that separately here.

As to the confrontation clause, we wrote,

The Supreme Court of the United States has recognized that "the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial," but this preference "must occasionally give way to considerations of public policy and the necessities of the case." *Maryland v. Craig*, 497 U.S. 836, 849 (1990) (emphasis in original). Accordingly, the Confrontation Clause has been interpreted "in a manner sensitive to its purposes and sensitive to the necessities of trial and the adversary process." *Id.* Trial courts "have the inherent authority and discretion to control the decorum and conduct of those in the courtroom to ensure that neither the defendant nor the Commonwealth is denied a fair trial." *Allen v. Commonwealth*, 286 S.W.3d 221, 230 (Ky. 2009).

Here, the trial court was motivated by a concern for the jury to fully observe the child witnesses as they testified. The trial court indicated that the original layout of the courtroom would have blocked the jury from fully observing the witnesses' faces as they testified. As the trial court explained, "if you can only see this much of a witness [non-verbally indicating that only the top half of the witnesses' face is visible behind the witness stand], not much credibility is being determined except from the tone of voice. This eliminates that — or reduces that, I should say. Your whole body can give signals as to truthfulness or not." It is the province of the jury — and the jury alone — to determine credibility through visual observation of body language. *Carson v. Commonwealth*, 621 S.W.3d 443, 449 (Ky. 2021). If confronted with only two options — the defendants are able to observe the witnesses' face[s] or the jury is able to observe the witnesses' face — it is clear that the trial court made the correct choice in placing the jury's observation of utmost importance.

On the other hand, there is no indication that the inability for the defendant to personally observe the witnesses face while they

13

spoke was detrimental to his ability to assist in his defense. "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Craig*, 497 U.S. at 845. The trial court encouraged defense counsel to reposition themselves in front of the witnesses as they testified, and defense counsel heeded this advice. While [Bubba] is correct in asserting that a witness is likely to be more truthful when speaking about the defendant in front of the defendant, the witnesses still knowingly remained in the presence of the defendants while testifying. And, while [Bubba] correctly noted that "face-to-face confrontation 'enhances the accuracy of factfinding by reducing the risk that a witness will wrongfully implicate an innocent person,'" *id.* at 846, the witnesses in this case each faced and identified both defendants while giving their testimony about the defendants. It is unclear what benefit the defendant would receive in a face-to-face assessment of the witnesses' credibility. Even if the defendant does perceive that the witness is being untruthful, the defendant and the witnesses for the Commonwealth are inherently adversarial, and it is to be expected that the defendants will either disagree with the witnesses' testimony or hope that the jury will disagree.

Weighing considerations of public policy and the necessities of the case, it is clear that the trial court made the most appropriate decision to allow the jury to assess the credibility of the witnesses. Therefore, the trial court did not abuse its discretion in configuring the courtroom layout to allow the witnesses to be seated in direct sight of the jury, albeit with their backs turned to the defendants.

*Watts*, 2025 WL 3768604 at *14-15. That reasoning is equally applicable to Watts's appeal. The circuit court's choice to position witnesses as it did reflected the context of the trial and the physical limitations of the courtroom and properly balanced Watts's right to confront the witnesses with the fact that many of those witnesses were his minor victims and the jury's need to have all resources available to judge the credibility of the witnesses. Given the importance of the witness testimony in this case, the court's arrangement was merited.

14

Watts's reference to KRS 421.350 does nothing to alter this conclusion. Put simply, KRS 421.350 is inapplicable to Watts's trial. The statute provides,

> The court may, on the motion of the attorney for any party and upon a finding of compelling need, order that the testimony of the child be taken in a room other than the courtroom and be televised by closed circuit equipment in the courtroom to be viewed by the court and the finder of fact in the proceeding. . . . [Or, t]he court may, on the motion of the attorney for any party and upon a finding of compelling need, order that the testimony of the child be taken outside the courtroom and be recorded for showing in the courtroom before the court and the finder of fact in the proceeding.

KRS 421.350(2)-(3). Neither scenario envisaged by the statute occurred with regard to the minor victims. They testified in the courtroom, in the presence of Watts and the jury, not from a different room with the aid of recording equipment. Since KRS 421.350 plainly does not apply in this instance, the age limitation of the statute also did not apply, and the circuit court was not required to find a compelling need to shield the witnesses. Accordingly, the circuit court properly arranged the courtroom to make the best use of the space available without violating Watts's rights either constitutionally or statutorily.

IV.    No cumulative error.

Finally, Watts claims that in the event we have discerned errors in the proceedings against him but determined such errors were harmless or otherwise insufficient to justify reversal, the cumulative effect of those errors entitles him to a new trial. Cumulative error is "the doctrine under which multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair." *Brown v.*

15

*Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010). Here, we did not find error in any of the claims raised by Watts. Accordingly, there are no errors to accumulate, and the doctrine does not apply.

## **CONCLUSION**

For the foregoing reasons, the judgment against James Lewis Watts is affirmed in all respects.

All sitting. Lambert, C.J.; Bisig, Conley, Goodwine, Keller, and Nickell, JJ., concur. Thompson, J., dissents by separate opinion.

THOMPSON, J., DISSENTING: The Court today rigidly applies *Dennis v. Commonwealth*, 306 S.W.3d 466 (Ky. 2010), which, in my view, unnecessarily restricts a defendant's ability to impeach a complaining witness with evidence of prior false accusations. While the rape shield rule properly guards victims against inquiries into sexual history or predisposition, it does not—and should not—foreclose the jury's access to meaningful credibility evidence once the sexual components of a prior allegation are removed. Impairing the truth seeking function of cross-examination is denied in cases where credibility is paramount. Because I believe a more balanced approach is required, I respectfully dissent.

This Court held in *Dennis* that false allegations of sexual misconduct do not involve "other sexual behavior" within the meaning of KRE 412. *Id.* at 473. As we explained, the rape shield rule addresses sexual conduct and sexual predisposition, not evidence that a witness has previously made untruthful statements. *Id.* Thus, KRE 412 does not impose a substantive bar against such

16

evidence once falsity has been appropriately shown. Rather, the rule's concern is preventing defendants from smuggling in sexual history evidence under the guise of impeachment. *Id.*

The credibility of the complaining witness in a sex crime case may be attacked by cross-examination concerning a prior false accusation if the prior accusations are false. *Id.* at 472. If the allegations are false, then courts proceed through the ordinary evidentiary sequence to determine whether the evidence is "probative of truthfulness or untruthfulness" under KRE 608(b) and conduct the KRE 403 balancing test. *Dennis*, 306 S.W.3d at 472–73.

*Dennis* requires the defendant prove the prior allegations are demonstrably false before cross-examining the witness. "To meet that standard, the proponent must show that there is a distinct and substantial probability that the prior accusation was false." *Id.* at 475. There must be a meaningful evaluation of the proposed evidence consistent with KRE 104, which at a minimum, must include a proffer of the evidence by the party seeking admission and argument regarding its admissibility under KRE 404 and 608. *Id.* at 470-72. KRE 412 cannot be used as a barrier to meaningful review. The court must substantively evaluate the claim of falsity before the evidence may be excluded.

In *Clinebell v. Commonwealth*, 368 S.E.2d 263, 266 (Va. 1988), the Supreme Court of Virginia adopted a "reasonable probability" of falsity standard. Under that rule, a prior accusation may be explored where the defendant demonstrates facts giving rise to a reasonable probability that the

17

prior statements were untrue. *Id.* This standard protects victims from harassment by filtering out speculative or conclusory impeachment, and it avoids erecting an evidentiary barrier so high that it effectively nullifies cross-examination in cases hinging on credibility.

The trial court should redact the prior false sexual allegation to remove the sexual content from the allegation and limit impeachment to cross-examination on a prior false allegation. Removing the sexual nature of the prior false allegation justifies modifying the standard for determining falsity, which will ensure that proper impeachment of a witness's credibility can occur.

When the sexual content of the prior accusation is removed, the evidence concerns a verbal act, not a sexual act. The impeachment therefore does not implicate KRE 412, which regulates evidence "offered to prove that any alleged victim engaged in other sexual behavior" or evidence offered to show sexual predisposition. KRE 412(a). A prior false statement—stripped of its sexual details—is not "sexual behavior" under any principled reading of the rule. This aligns with the logic underlying *Dennis*, which sought to prevent admission of sexual details, not to foreclose all impeachment based on prior untruthful statements.

Evidence the witness previously made a false allegation—stripped of sexual specifics—is probative of truthfulness under KRE 608(b). *See Allen v. Commonwealth*, 395 S.W.3d 451, 461 (Ky. 2013) (reading KRE 608 broadly to permit impeachment regarding conduct based on a misdemeanor conviction related to untruthful conduct). The protections of no extrinsic proof on cross-

18

examination and KRE 403 remain fully available to trial courts to prevent prejudice or confusion. *Dennis*, 306 at 472.

Cross-examination serves as the primary mechanism by which a jury, as the sole judge of witness credibility, is able to assess the reliability, bias, and motivation of those who testify. *Davis v. Alaska*, 415 U.S. 308 (1974). Cross-examination has long been recognized as "the greatest legal engine ever invented for the discovery of truth," affording the fact finder the opportunity to observe a witness face to face and judge his demeanor on the stand. *Kentucky v. Stincer*, 482 U.S. 730, 736 (1987) (quoting other sources). The right to cross-examine is not a mere procedural formality. It is a constitutionally protected means of exposing a witness's potential biases, prejudices, and motives—the precise facts from which a jury draws its credibility determinations. *Davis*, 415 U.S. at 316–17. Consistent with these principles, Kentucky courts have held that the credibility of a witness's relevant testimony is always at issue, and a trial court may not exclude evidence that impeaches credibility even where such evidence would be inadmissible on a substantive issue. *Graham v. Commonwealth*, 571 S.W.3d 575, 582 (Ky. 2019).

Where a prosecution hinges largely on the testimony with little collaborating evidence, credibility is often the central issue, and even brief cross-examination into prior false statements can meaningfully illuminate the truth seeking process. Our jurisprudence must ensure that the rape shield rule does not inadvertently shield credibility defects rather than sexual history evidence.

19

I would therefore adopt a process that redacts the sexual content from the prior allegation and uses a reasonable probability of falsity standard for future cases. This would offer a balanced approach that respects KRE 412's protective purpose, aligns with our constitutional obligations, and preserves the evidentiary flexibility necessary for fair trials. Such a standard would still require defendants to present evidence of falsity but would avoid transforming the falsity gate into an insurmountable threshold.

For these reasons, I respectfully dissent.

COUNSEL FOR APPELLANT:

Aaron R. Baker
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General

Ryan D. Mosley
Assistant Attorney General